224 S.W.3d 139 (2007)
In the Interest of K.K., K.K., A.K. and I.K.
No. 27857.
Missouri Court of Appeals, Southern District, Division Two.
April 13, 2007.
Motion for Rehearing or Transfer Denied May 7, 2007.
Application for Transfer Denied June 26, 2007.
*141 Steven Keith Paulus, Cuba, MO, for appellant.
Robert Scott Killen, Cape Girardeau, MO, for respondent.
Frank B. Schweitzer, Salem, MO, for juvenile/minor.
Motion for Rehearing or Transfer to Supreme Court Denied May 7, 2007.
JEFFREY W. BATES, Chief Judge.
M.S. (Mother) appeals from a judgment terminating her parental rights to I.K., A.K., K.T.K. and K.A.K. (collectively referred to as the children) pursuant to a petition filed by the Deputy Juvenile Officer of Crawford County, Missouri. The trial court terminated Mother's parental rights on the statutory grounds found in § 211.447.4(2) (abuse or neglect) and in § 211.447.4(3) (failure to rectify).[1] Mother presents four points on appeal. In her first point, she challenges the trial court's jurisdiction to terminate her parental rights pursuant to § 211.447. In her other points, she contends the decision to terminate her parental rights was erroneous because certain findings made by the trial court were against the weight of the evidence. We affirm.

I. Factual and Procedural Background
When we review a trial court's judgment terminating parental rights, we consider the facts and the reasonable inferences derived therefrom in a light most favorable to the judgment. In re L.R.S., 213 S.W.3d 161, 164 (Mo.App.2007); In re L.M., 212 S.W.3d 177, 180 (Mo.App.2007). Viewed in that light, the following evidence was adduced at trial.
Mother and A.P.K. (Father) met in 2000 and had four children together. Their son, I.K., was born on November 29, 2000. *142 Their daughter, A.K., was born on February 15, 2003. Their twin sons, K.T.K. and K.A.K., were born on February 3, 2004.[2] Mother and Father were not married, and he only resided with his family part of the time.
Records kept by the Children's Division (Division) revealed that the first complaint about Mother neglecting the children occurred on April 28, 2003.[3] A police officer responding to an emergency call found I.K., then two and one-half years old, playing naked near the road and close to traffic. He was dirty and had insect bites all over his body. After the officer brought I.K. home, it took Mother five to ten minutes to answer the door. When a Division investigator interviewed Mother, she said that I.K. was not in the road and that the officer had yelled at her for no reason. The Division opened a case file to investigate the lack of supervision issue.
A second neglect complaint against Mother was made on September 26, 2003. A caller reported that Mother and Father were attending a WIC meeting at the Health Department the prior evening.[4] When they were asked where I.K. was, they answered that the child was at home with a babysitter whose identity they would not reveal. After hearing a child being beaten in the Health Department parking lot, the caller discovered I.K. in a car. He was being hit by an adult male who appeared drunk. When police arrived, the man was arrested for driving while intoxicated. There were no car seats in the car, and the caller described I.K. as "grossly filthy." The investigator who received the report developed a plan with Mother to address the children's safety and hygiene.
A third neglect complaint against Mother was made on April 13, 2004. A neighbor called the Division to report that Mother had left the children unsupervised in her trailer home. The family used the back door of the trailer for ingress and egress because the front door lacked a porch or steps. This door either had been left open, or one of the children had opened it. The caller saw A.K., who was then 14 months old, crawl to the open door and fall five feet onto concrete. She landed on the side of her face and sustained "a pretty good gash on her forehead." A.K. crawled toward the trailer while she screamed and cried. The caller went outside, picked A.K. up and then yelled inside the open door for someone to get the baby. No one answered because there was no adult in the home with the children. Shortly thereafter, Mother came walking up the road. She had been gone for 30 minutes. When the caller explained to Mother what had happened and asked where she had been, Mother grabbed A.K., went inside and slammed the door.
Later that evening, a deputy sheriff and Division social worker Laura Halbert (Halbert) began looking for the children. Mother and the children were found at Father's nearby apartment, where all four children were taken into protective custody. *143 I.K., K.T.K., and K.A.K. were sent to an emergency foster home. Because Mother had not obtained any medical treatment for A.K., she was taken by ambulance to Sullivan Hospital. After being diagnosed with a head injury, she was released into Halbert's custody. A.K. was then taken to the same foster home as her siblings. A nurse at the hospital and the foster mother each told Halbert that the bottles Mother had given the children contained rotten milk.
On April 15, 2004, the Crawford County Deputy Juvenile Officer filed a petition alleging that the children were in need of care and treatment because they had been subjected to chronic neglect by their parents. That same day, the court entered a protective custody order that made the children temporary wards of the court. At the adjudicatory hearing held on July 8, 2004, the court found that the allegations of the petition were proven and that the children were subject to the court's jurisdiction pursuant to § 211.031.1(1)(a)-(b). While the children were in the custody of the Division, Mother was ordered to contribute to their support and maintenance in the amount and manner specified by the court.
The Division's initial goal was reunification of the children with their parents. A social service plan (SSP) for Mother was approved by the court and filed on August 23, 2004. Among other obligations, the terms of the SSP required Mother to: (1) complete a psychological evaluation within 90 days and comply with all recommendations within 30 days thereafter; (2) participate in counseling within 30 days; (3) complete an alcohol/drug/substance abuse assessment and comply with all recommendations within 30 days thereafter; (4) complete random drug screens on the day requested and agree that "failure to comply will be treated as a positive result" for illegal drug use; (5) obtain employment; (6) provide child support of at least $50 per month; (7) acquire and keep a stable home environment; (8) participate in weekly supervised visitation; (9) agree not to use corporal punishment on the children during visitation and (10) begin parent aid classes within 30 days and timely complete such classes.
Approximately nine and one-half months elapsed between the adoption of the SSP and the filing of the petition to terminate Mother's parental rights. As demonstrated by the following factual summary, Mother made virtually no progress in complying with any of the foregoing requirements during that time period.
The Division scheduled an evaluation of Mother by psychologist Elbert Bolsen (Bolsen) within 90 days, but Mother did not show up for the appointment. The evaluation was eventually conducted on January 11, 2005. Bolsen diagnosed Mother as having Parent-Child Relational Problems involving supervision and care issues and a Major Depressive Disorder. If Mother were not stable enough to care for the children within 18 months after they had been taken into protective custody, Bolsen opined that they should not be returned to Mother. In order to become stable enough to care for the children, Bolsen recommended that Mother undergo counseling, receive medical treatment for her depressive disorder, become employed and write out a "complete plan of parenting to include how she will protect the children and provide for their physical, emotional, social, and educational needs." Mother failed to comply with any of these recommendations.
In September 2005, Bolsen also conducted a related evaluation of I.K. The history provided to Bolsen was that I.K. and his siblings were subjected to extreme neglect by being locked in a closet for significant *144 periods of time so Mother could sleep. The children also were left alone for periods of time. Among other problems, Bolsen diagnosed I.K. as having a reactive attachment disorder (RAD). RAD develops when a child does not experience adequate emotional nurturing, support and safety in his or her environment for long periods of time. This disorder is "seen as a result of inadequate parenting in the sense of nurturing, protection and care." I.K.'s RAD developed due to the inadequate care he received from infancy until he was placed in protective custody in April 2004. This disorder caused I.K. to have real difficulty in making emotional attachments with other people. While I.K. had been making progress since he had been removed from Mother's custody and could eventually overcome his RAD, he still had extreme difficulty with issues of trust, sharing and social interaction. Bolsen also opined that, once a child like I.K. has been in alternative care for a period of one year or more, his attachments become so central to the child's health, well-being and development that a change of placement would traumatize the child.
After Mother was evaluated by Bolsen, the Division tried to schedule counseling with social worker Tina Lett (Lett). Mother canceled one appointment and failed to show up for another. Mother and Father finally met with Lett at their home for a joint counseling session. They were arguing with each other, and Father became angry and left. Mother was resistant to counseling. She would not set up any treatment goals, which meant she was unwilling to identify any problems that she needed to address. Instead, Mother denied responsibility and blamed others for her problems. Lett offered to provide Mother with additional counseling if she would set up some treatment goals. Mother failed to do so and never attended any more counseling sessions.
Prior to the adoption and approval of the SSP, Mother underwent a drug and alcohol assessment at Southeast Missouri Community Treatment Center (the Treatment Center) on April 15, 2004. To receive treatment, a person must admit to using unlawful substances or to having a substance abuse problem. Mother self-reported that she had no drug or alcohol problems, but she was not tested for the presence of drugs or alcohol to verify what she said. Based on the information provided by Mother, the Treatment Center advised that she did not meet the criteria for treatment. During a scheduled visitation with the children on March 8, 2005, Division staff observed behavior by Mother that suggested she was under the influence of drugs. Because of Mother's erratic behavior, the session ended 30 minutes early. Mother was asked to go across the street to take a drug test. She refused because "she didn't have time." A sample of Mother's hair collected on March 10, 2005 tested positive for methamphetamine. Mother later admitted that she had been using methamphetamine because she was "very depressed." All visitation was suspended until Mother entered and completed a drug treatment program. Mother underwent another drug assessment at the Treatment Center in April 2005. She received a recommendation that she enter the residential inpatient drug treatment program and participate in outpatient classes until she could be admitted as an inpatient. Mother refused to comply with that recommendation. A permanency hearing concerning the children was held on April 28, 2005. In pertinent part, the docket entry made that day states: "Court notes that though directed by the court to complete drug testing today's date, both natural parents refuse to remain for purposes of drug testing and left the courthouse without supplying a sample for that *145 purpose." Mother persisted in her refusal to obtain any drug treatment until one week before trial commenced on February 28, 2006. At that point, Mother finally voluntarily enrolled herself in an outpatient drug treatment program at the Treatment Center.
The SSP required Mother to pay at least $50 per month to support her children. After the court approved and ordered the implementation of the SSP, Mother quit her job. She remained unemployed until the petition to terminate her parental rights was filed. In September 2005, Mother got a job at a cafe and was working there at the time of trial. She never made any financial contribution to the support of her children. She provided only token non-financial support.[5]
Mother never acquired and kept a stable home environment. When the children were taken into protective custody, Mother lived in a trailer owned by her mother. Between April 2004 and February 2006, Mother moved frequently. She lived with her mother, her grandmother and Father's mother. Before the petition to terminate Mother's parental rights was filed, she was always living at someone else's residence. From April 2005 until October 2005, the Division did not know Mother's whereabouts. At the time of trial, Mother and Father were living in a house together.
Mother agreed to participate in weekly supervised visitation with the children, to call at least two hours in advance if she intended to cancel a visit and to not use corporal punishment on her children during visitations. The visitation schedule provided for two weekly visits lasting 90 minutes. Division staff supervised the visitation process and kept records concerning the visits.
Mother's visits with the children began on April 16, 2004 and ended on March 8, 2005. There were approximately 60 scheduled visitation opportunities during that time frame. Mother was a "no show" on 11 occasions. Her failure to show up as scheduled resulted in visitation being suspended three times. In addition to not showing up at all, Mother arrived substantially late or left substantially early on five other occasions.
Division staff also noted a number of problems during Mother's interaction with the children. Mother frequently argued with staff, Father or Mother's relatives during visits. Mother also used extremely vulgar language in front of the children, reasoning that the children had heard her "talk like that their whole life, so why does she have to change now?" Mother slapped I.K. twice during one visit, resulting in the visit being cut short. On a number of visits, Mother paid little attention to the children. The most serious problem, however, was Mother's repeated failure to appreciate behavior on her part which exposed the children to potential harm while they were under Mother's supervision.[6]
K.T.K. and K.A.K., who were born six weeks prematurely, had been diagnosed with respiratory distress syndrome, an atrial septal defect, apnea and gastroesophageal reflux. As a result, each child was connected to an apnea monitor which assessed his breathing and heart rate. An alarm sounded if the child stopped breathing for at least five seconds or if the cables *146 became detached. During the visitation on April 20, 2004, K.A.K.'s alarm began sounding. To avoid dealing with the problem, Mother simply turned off the monitor. During the next visitation, Division staff reiterated to Mother the importance of not turning the monitors off. At the August 19, 2004 visitation, Division staff noticed that one of the twins' apnea monitors was disconnected. Mother refused to plug in the monitor and said the twins did not need to be on monitors. When Mother was given a warning, her response was, "I don't f______ care!" The visit was ended at that point. Such behavior caused concerns about the care the twins would receive during visitation and if they were placed back in their parents' custody with the health problems they had. At the September 2, 2004 visit, Mother again argued with Division staff about keeping the twins connected to monitors. During the next visitation on September 7, 2004, K.A.K.'s foster parents reported that the child's monitor had sounded three times the prior weekend when he stopped breathing and that the twins' doctor wanted them to remain connected to the apnea monitors as long as they were sounding.
At the June 22, 2004 visitation, 16-month-old A.K. climbed into a car seat on top of K.T.K., who was only four and one-half months old. Later, A.K. tried to get into the diaper bag to obtain medicine inside. Mother did nothing to stop either incident. On November 4, 2004, Mother placed K.A.K. on a chair to change him. She then left to take some crayons away from A.K., and K.A.K. nearly fell off of the chair. At the visitation on January 18, 2005, Mother gave K.T.K. a plastic bag to put in his mouth because he was fussy. During the same visit, K.A.K. began putting small things in his mouth. After swallowing a piece of cellophane, he began choking and threw up. Division staff had to go into the visitation room to make sure the child was all right. On March 1, 2005, Mother "acted as if the visit was an inconvenience for her, she would roll her eyes and get aggravated with the kids when she had to get them something or keep them from getting hurt." On March 8, 2005, Mother attended a visitation with the children while she was under the influence of drugs. When one of the twins began crying, Mother became frustrated and tried to put the child back in his car seat. In the process, Mother banged the child's head into the car-seat handle. The more the child cried, the more roughly he was handled by Mother. A Division staff member had to enter the room and take the child from Mother. Because of Mother's erratic behavior, the visit was ended early. After Mother's drug test was positive for methamphetamine, her visitation rights were suspended until she entered and completed a drug treatment program. Mother had no further visits with her children because she failed to comply with this requirement.
Mother and Father were supposed to begin parenting classes in August 2004. Due to excessive absences, they were required to restart their instruction in October 2004. Mother and Father ultimately completed parenting classes on November 10, 2004.
Based on Mother's failure to seek drug treatment and to otherwise comply with the SSP, the Division recommended that Mother's parental rights be terminated. On June 8, 2005, Deputy Juvenile Officer Nick Hutchinson (DJO Hutchinson) filed a two-count petition to terminate the parental rights of Mother and Father. Count I alleged that Mother's parental rights should be terminated pursuant to § 211.447.4(2) and § 211.447.4(3). When the petition was filed, the children had been in the Division's custody for over 13 months.
*147 After the children were placed in foster care, they continued to have a very close relationship with each other. I.K. was placed in a foster home with A.K. They lived next door to the twins' foster parents. The foster mothers are sisters. The children had daily contact with each other and became very bonded with their foster parents.
The trial on the petition was held on February 28, 2006. DJO Hutchinson presented testimony from psychologist Bolsen, counselor Lett and Division supervisor Randall Ryno. Mother presented testimony from herself and DJO Hutchinson. Father testified on his own behalf. In addition, 15 documentary exhibits were admitted in evidence. At the conclusion of the trial, the court took the matter under advisement.
On June 7, 2006, the court entered a judgment terminating Mother's parental rights under Count I of the petition on two statutory grounds. First, the court found that Mother's parental rights should be terminated pursuant to § 211.447.4(2) because she neglected the children. In support of abuse or neglect ground, the court made the additional findings required by § 211.447.4(2)(a)-(d). Second, the court found that Mother's parental rights should be terminated pursuant to § 211.447.4(3) because: (1) the children had been under the court's jurisdiction for a period of one year when the termination petition was filed; (2) the conditions which led to the assumption of jurisdiction still persist, and conditions of a potentially harmful nature still exist; and (3) there is little likelihood that those conditions will be remedied at an early date so that the children can be returned to Mother in the near future, and the continuation of the parent-child relationship greatly diminishes the children's prospects for early integration into a stable and permanent home. In support of the failure to rectify ground, the court made the additional findings required by § 211.447.4(3)(a)-(d). The court further found that termination of Mother's parental rights was in the children's best interest. This appeal followed.

II. Standard of Review
To terminate parental rights, a trial court must use a two-step analysis. In re S.J.H., 124 S.W.3d 63, 66 (Mo.App. 2004). In the first step, the court must find by clear, cogent and convincing evidence that one or more statutory grounds for termination exist. § 211.447.5; In re P.L.O., 131 S.W.3d 782, 788 (Mo. banc 2004). "Clear, cogent, and convincing evidence is evidence that instantly tilts the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true." In re S.M.H., 160 S.W.3d 355, 362 (Mo. banc 2005). After finding one or more statutory grounds for termination have been proven, the trial court then moves to the second step and must determine, by a preponderance of the evidence, whether the termination of parental rights is in the child's best interest. § 211.447.5; P.L.O., 131 S.W.3d at 789; S.J.H., 124 S.W.3d at 66.
On appeal, we review a trial court's decision that one or more statutory grounds for termination exist to determine whether the ruling is supported by substantial evidence, is against the weight of the evidence, or involves an erroneous application or declaration of the law. S.M.H., 160 S.W.3d at 362. We will not reverse the trial court's decision unless we are left with the firm belief that the decision was wrong. Id. Conflicting evidence will be reviewed in the light most favorable to the judgment of the trial court. In re A.S.W., 137 S.W.3d 448, 452-53 (Mo. banc *148 2004). We defer to the trial court's assessment of witness credibility. In re C.F.C., 156 S.W.3d 422, 426 (Mo.App.2005). We use an abuse of discretion standard to review a trial court's decision that termination of parental rights is in the child's best interest. In re B.J.K., 197 S.W.3d 237, 243 (Mo.App.2006).[7]

III. Discussion and Decision
Mother presents four points for decision. In Point I, she challenges the jurisdiction of the court to terminate her parental rights because the children had only been under the jurisdiction of the court for 13 months when the petition to terminate Mother's parental rights was filed. In Point II, Mother contends the trial court's decision to terminate her parental rights based on her mental condition was against the weight of the evidence. In Point III, Mother contends the trial court's decision to terminate her parental rights based on her chemical dependency was against the weight of the evidence. In Point IV, Mother contends the trial court's decision to terminate her parental rights for repeatedly or continuously failing to provide the children with necessary care, custody and control was against the weight of the evidence. For ease of analysis, we will address Mother's points out of order.

Point I
Citing § 211.447.2(1), Mother's first point contends the trial court lacked jurisdiction because, when the petition to terminate her parental rights was filed, the children had not been in foster care for at least 15 of the most recent 22 months. Mother argues that this 15-month minimum time frame must be satisfied even when the petition to terminate is based on one or more of the grounds specified in § 211.447.4. We disagree. In pertinent part, the subsection of the statute relied upon by Mother states:
2. Except as provided for in subsection 3 of this section, a petition to terminate the parental rights of the child's parent or parents shall be filed by the juvenile officer or the division, or if such a petition has been filed by another party, the juvenile officer or the division shall seek to be joined as a party to the petition, when:
(1) Information available to the juvenile officer or the division establishes that the child has been in foster care for at least fifteen of the most recent twenty-two months. . . .
§ 211.447.2(1). At one time, this subsection was treated as an independent ground for terminating a parent's rights. See, e.g., In re K.J.K., 108 S.W.3d 62, 67 (Mo.App. 2003). This interpretation of § 211.447, however, was incorrect. See In re M.D.R., 124 S.W.3d 469, 472 n. 3 (Mo. banc 2004). In M.D.R., the Supreme Court held that § 211.447.2(1) merely contains a temporal trigger determining when a juvenile officer or the Division is required to file a termination petition. Id. at 475. In contrast, § 211.447.3 and § 211.447.4 identify certain parental conduct which permissively authorizes a juvenile officer or the Division to file a termination petition. Id. Prior cases reaching a contrary result, such as *149 this court's decision in K.J.K., were no longer to be followed. Id. at 472 n. 3.
In the case at bar, § 211.447.2 has no application because the children were not in foster care long enough to require the juvenile officer or the Division to file a petition to terminate Mother's rights, and this subsection was not used as a ground for termination. Instead, the deputy juvenile officer relied in the petition upon § 211.447.4(2) and § 211.447.4(3) as the statutory grounds for terminating Mother's parental rights. Only the latter section has a specific time trigger relating to filing:
4. The juvenile officer or the division may file a petition to terminate the parental rights of the child's parent when it appears that one or more of the following grounds for termination exist:
. . .
(3) The child has been under the jurisdiction of the juvenile court for a period of one year, and the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home. . . .
§ 211.447.4(3) (emphasis added). The language of this subsection is plain and unambiguous. In re B.J.K., 197 S.W.3d 237, 244 (Mo.App.2006). It permissively authorizes the juvenile officer or the Division to file a petition to terminate parental rights once the child has been under the court's jurisdiction for a period of one year.
Here, the children were taken into protective custody by order of the court on April 14, 2004. At that point, the court's jurisdiction attached. § 211.131.3; In re M.D.S., 837 S.W.2d 338, 342 (Mo.App. 1992); In re C.G., 539 S.W.2d 705, 706 (Mo.App.1976). The petition to terminate Mother's parental rights was filed on June 8, 2005. By then, the children had been under the court's jurisdiction over 13 months. The petition so alleged. In order to terminate Mother's rights, the trial court also was required to make a finding that the children had been under the court's jurisdiction for at least a year. See, e.g., B.J.K., 197 S.W.3d at 244; In re E.T.C., 141 S.W.3d 39, 47-48 (Mo.App. 2004). The court so found. Consequently, Mother's jurisdictional argument has no merit. Point I is denied.

Point IV
In Mother's fourth point, she contends the termination of her parental rights pursuant to § 211.447.4(2) and § 211.447.4(3) was erroneous because the trial court's finding that she repeatedly or continuously failed to provide the children with necessary care, custody and control was against the weight of the evidence. "Weight of the evidence" means its weight in probative value, rather than the quantity or amount of evidence. Nix v. Nix, 862 S.W.2d 948, 951 (Mo.App.1993). The weight of the evidence is not determined by mathematics, but depends on its effect in inducing belief. Id. "We exercise extreme caution in considering whether a judgment should be set aside on the ground that it is against the weight of the evidence, and will do so only upon a firm belief that the judgment was wrong." In re D.M.S., 96 S.W.3d 167, 171 (Mo.App. 2003). As previously noted, the trial court found by clear, cogent and convincing evidence that termination of Mother's parental rights was warranted on the abuse or neglect ground and the failure to rectify ground. See § 211.447.4(2); *150 § 211.447.4(3). When a trial court finds multiple statutory bases to terminate a parent's rights, we need only determine that one of the statutory grounds was proven in order to affirm the judgment. In re L.A.M.R., 179 S.W.3d 418, 419 (Mo. App.2005). Because the trial court's decision to terminate Mother's parental rights pursuant to § 211.447.4(3) on the failure to rectify ground was not against the weight of the evidence, we need not address any claim of error relating to the abuse or neglect ground set out in § 211.447.4(2). In re L.M., 212 S.W.3d 177, 181 (Mo.App. 2007).
A trial court may base the termination of a parent's rights on the failure to rectify ground when:
The child has been under the jurisdiction of the juvenile court for a period of one year, and the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home. . . .
§ 211.447.4(3). By parsing this subsection of the statute, it becomes evident that there are three required findings the trial court must make. In re B.J.K., 197 S.W.3d 237, 243 (Mo.App.2006). The first is that the child has been under the court's jurisdiction for a period of one year. Id. at 244. The second required finding is that "the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist. . . ." § 211.447.4(3) (emphasis added). Thus, the trial court may find that one or both of these alternatives are satisfied. L.M., 212 S.W.3d at 181-82. The third required finding is that "there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home[.]" § 211.447.4(3) (emphasis added). Once again, the trial court may find that one or both of these alternatives are satisfied. L.M., 212 S.W.3d at 181-82. This subsection of the statute further provides that:
In determining whether to terminate parental rights under this subdivision, the court shall consider and make findings on the following:
(a) The terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms;
(b) The success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child;
(c) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;
(d) Chemical dependency which prevents the parent from consistently providing necessary care, custody and control over the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control[.]
§ 211.447.4(3). The above factors are simply categories of evidence to be considered *151 along with other relevant evidence, rather than separate grounds for termination in and of themselves. L.M., 212 S.W.3d at 182. Nevertheless, proof of one such factor is sufficient to support termination on the statutory failure to rectify ground. In re A.S.O., 75 S.W.3d 905, 912 (Mo.App. 2002); In re N.M.J., 24 S.W.3d 771, 778 (Mo.App.2000).
Here, the trial court found: (1) the children had been under the court's jurisdiction for a period of one year when the petition was filed; (2) the conditions which led to the assumption of jurisdiction still exist, and conditions of a potentially harmful nature continue to exist; and (3) there is little likelihood those conditions could be remedied at an early date so the children could be returned to Mother, and the continuance of the parent-child relationship greatly diminishes the children's prospects for early integration into a stable and permanent home. In making those findings, the court considered the following:
1. Mother "failed to progress in complying with the terms of the social service plan" approved by the court.
2. "[T]he Division has been unable to aid [Mother] on a continual basis in adjusting her circumstances or conduct in that [Mother] continued to use illegal substances and there was a lack of participation and cooperation with the terms of the [SSP] for reunification and [Mother] refuses to believe that the said children have any physical or mental needs, and still is lacking in progress in very vital areas that are needed to provide a safe and stable home for her children who have many mental and physical needs."
3. Mother's diagnosed mental condition of Major Depressive Disorder.
4. Mother's chemical dependency on methamphetamine.
See § 211.447.4(3)(a)-(d).
As we understand Mother's point, her challenge focuses solely on the trial court's finding that "the conditions which led to the assumption of jurisdiction still exist, and conditions of a potentially harmful nature continue to exist. . . ." She argues this finding was against the weight of the evidence because, by deciding her failings continued to exist and were of sufficient severity to justify termination, the trial court failed to consider the foreseeable future and the progress she made in satisfying the SSP. We disagree.
In applying § 211.447.4(3), the ultimate issue "is the continued existence of an unremedied, neglectful situation." In re C.F.C., 156 S.W.3d 422, 430 (Mo.App.2005). The trial court initially took jurisdiction because Mother failed to provide the children with proper care, custody and control. In particular, Mother exhibited an inability to discern how her behavior endangered the children's health and safety. As I.K.'s development of RAD demonstrates, this problem was one of long-standing duration.
To help Mother address this issue, the SSP was implemented. A social service plan can provide a trial court with "highly relevant evidence" in a termination case. In re K.A.W., 133 S.W.3d 1, 10 (Mo. banc 2004). As the Supreme Court noted, "[a] parent's efforts to comply with such a plan will provide the court with an indication of the parent's likely efforts in the future to care for the child. A lack of effort to comply with a plan, or a lack of success despite effort, can predict future problems." Id. (citation omitted). There is overwhelming evidence in this case that Mother made almost no progress in complying with the SSP. Mother's evaluation by psychologist Bolsen resulted in a diagnosis *152 of Major Depressive Disorder and a recommendation that the condition be treated. Mother refused to comply. Mother did not obtain counseling because she refused to recognize that she had any problems which needed to be addressed. Mother's untreated depression led her to use methamphetamine and to visit her children while under the influence of that drug. Mother's continuing need for drug treatment was demonstrated by her own decision to enroll in a drug rehabilitation program only a week before trial. After the children were placed in protective custody, Mother quit her job and never provided them with any financial support. She failed to acquire and keep a stable home environment. Mother's participation in weekly visitation was also problematic. She missed a number of scheduled visits and arrived late or left early at others. On other occasions, Mother was inattentive to the children during visitations. Mother also used corporal punishment during visitation after agreeing not to do so, and the visit was cut short when she persisted in that behavior after being told to stop. Most importantly, Division staff noted a number of instances in which Mother's behavior potentially endangered her children. Conduct such as unplugging an apnea monitor, not stopping a child from trying to get into medicine, nearly letting an infant fall off of a chair, letting a child chew on a plastic bag and allowing a child to choke on a fragment of cellophane demonstrates that Mother still cannot understand or appreciate how her behavior threatens the health and safety of the children. Finally, Mother's right to visit the children was suspended for drug use. She could have arranged for visitation to be reinstated by obtaining treatment through the Division, but she declined to do so. The only way in which Mother did comply with the SSP, albeit in an untimely fashion, was to complete parenting classes on her second attempt.
In sum, Mother's near-total noncompliance with the SSP demonstrates a failure to address the issue of her ability to provide the children with proper care, custody and support. The trial court clearly believed, and we agree, that Mother's lack of progress in complying with the SSP is predictive of future problems. Id. Based on our careful review of the record, it is clear that Mother was "unwilling or unable to make adjustments necessary to take on the role of parent." In re L.R.S., 213 S.W.3d 161, 170 (Mo.App.2007). Therefore, the trial court's finding that Mother failed to rectify conditions of a potentially harmful nature is not against the weight of the evidence. See In re K.A.W., 220 S.W.3d 310 (Mo.App.2007). Point IV is denied.

Points II and III
In Point II, Mother contends the trial court's decision to terminate her parental rights pursuant to § 211.447.4(2) and § 211.447.4(3) based on her mental condition was against the weight of the evidence. In Point III, Mother contends the trial court's decision to terminate her parental rights pursuant to § 211.447.4(2) and § 211.447.4(3) based on her chemical dependency was against the weight of the evidence. Insofar as these points challenge the trial court's decision on the abuse or neglect ground, we need not address them because we are affirming the trial court's termination of Mother's parental rights on the failure to rectify ground set out in § 211.447.4(3). See In re L.M., 212 S.W.3d 177, 181 (Mo.App.2007); In re L.A.M.R., 179 S.W.3d 418, 419 (Mo.App. 2005). Insofar as these points challenge the trial court's consideration of the factors set *153 out in § 211.447.4(3)(c)-(d), we need not address them because there was ample evidence to support the trial court's findings with respect to the factors set out in § 211.447.4(3)(a)-(b). See In re A.S.O., 75 S.W.3d 905, 912-13 (Mo.App.2002); In re N.M.J., 24 S.W.3d 771, 778 (Mo.App.2000). In light of our disposition of Point IV, Points II and III are moot. The judgment of the trial court is affirmed.
BARNEY and LYNCH, JJ., Concur.
NOTES
[1] All references to statutes are to RSMo (2000).
[2] The judgment also terminated Father's parental rights, and his separate appeal from the judgment is pending. Facts concerning Father's actions will be recounted insofar as they bear upon the trial court's decision to terminate Mother's parental rights.
[3] Mother's prior history with the Division was summarized in a mandatory report submitted to the trial court, pursuant to § 211.401.1, on September 27, 2004. At the termination hearing, the trial court took judicial notice of all of the statutory reports filed by the Division. These reports also were collectively admitted in evidence as Exhibit G.
[4] WIC is an acronym for the Women, Infants and Children Special Supplemental Food Program. See § 191.807.
[5] Mother brought the children clothing one time. During other visits, she sporadically provided the children with snacks and toys.
[6] Mother's inability to comprehend the negative aspects of her behavior had not changed as of the date of the trial. Mother testified that the only inappropriate thing she ever did was leaving the children to make a phone call.
[7] In the case at bar, none of Mother's points on appeal raise the issue that, if grounds for termination do exist, the trial court erred in determining it would be in the children's best interest to terminate Mother's parental rights. "An appellate court reviews only issues raised in the points relied on in an appellant's brief." In re L.A.M.R., 179 S.W.3d 418, 421 (Mo.App.2005); In re A.K.F., 164 S.W.3d 149, 152 (Mo.App.2005) (same holding). Consequently, we will not address the best interest issue. See In re N.R.W., 112 S.W.3d 465, 469 (Mo.App.2003); In re J.L.F., 99 S.W.3d 15, 16-17 n. 2 (Mo.App.2003).