In the Interest of T.L.B., M.K.S., N.T.S., N.J.S., and K.M.S., Minors,

A.M.B., Natural Mother, Appellant,

v.

Greene County Juvenile Office, Respondent.

Nos. SD 31135, SD 31136, SD 31137, SD 31138, SD 31139.

Missouri Court of Appeals, Southern District, Division Two.

Sept. 21, 2011.

Application for Transfer Denied Oct. 13, 2011.

John E. Kelly, Springfield, MO, Appellant.

William C. Prince, Springfield, MO, for Respondent.

Marion Ann Adams, Springfield, MO, for Minors.

WILLIAM W. FRANCIS, JR., Presiding Judge.

A.M.B. ("Mother") appeals the respective judgments[1] terminating parental rights to her minor children, T.L.B., M.K.S., N.T.S., N.J.S., and K.M.S. (collectively referred to as "the Children"). Finding no merit to Mother's points, we affirm the judgments of the trial court.[2]

### Factual and Procedural History

While our recitation of the relevant facts is generally in accordance with the principle that the evidence is viewed in the light most favorable to the judgment, *see In re*

---

1. The individual cases for each child were consolidated for this appeal. A petition was filed on behalf of each child and a separate judgment was entered with respect to each child.

2. The respective fathers were dismissed from the underlying termination action and are not parties to this appeal.

*CAM.*, 282 S.W.3d 398, 401 (Mo.App. S.D. 2009) and *In re M__R__F__*, 907 S.W.2d 787, 789 (Mo.App. S.D.1995), we also cite opposing evidence because grounds for termination must be supported by evidence that "instantly tilts the scales in favor of termination *when weighed against the evidence in opposition* and the finder of fact is left with the abiding conviction that the evidence is true." *In the Interest of K.A.W.*, 133 S.W.3d 1, 12 (Mo. banc 2004) (emphasis added).

Mother's formal involvement with the Children's Division of the Missouri Department of Social Services ("the Children's Division") began after a hotline report dated December 1, 2008, alleging "untreated illness and injury" and "lack of food." Following an investigation, a Children's Division's caseworker, Nicole Bell ("Ms. Bell"), determined Mother failed to provide needed eyeglasses for N.J.S. The Children's Division entered into a safety plan with Mother whereby she agreed to provide the eyeglasses for N.J.S.

The Children's Division received a second report on December 8, 2008, alleging Mother had recently made threats to commit suicide and kill the Children. Ms. Bell met with Mother at the psychiatric unit of Lester E. Cox Medical Center North. During that meeting, it was discovered that in 2006 there was an incident where Mother pulled her car into the garage and left it running with the Children in the vehicle while she went into the house; she subsequently changed her mind and retrieved the Children. Additionally, while in the hospital, Mother wrote a note in crayon saying she was going to give the Children to Jesus. Further investigation revealed that on one occasion when the Children were unsupervised, a fire started in the microwave and on another occasion Mother, while the Children were passengers, drove her car through an activated railroad crossing resulting in serious injury to T.L.B.

After the December 8, 2008 incident, the Children were taken into protective custody due to abuse and neglect concerns.[3] Petitions for abuse and neglect were subsequently filed due to Mother's "emotional conditions interfer[ing] with her ability to parent the Children." On December 23, 2009, the Greene County Juvenile Office filed petitions to terminate the parental rights of Mother in, to, and over the Children.

On September 7, 2010, a bench trial was held on the termination of Mother's parental rights to the Children.

Tamara Boggess ("Ms. Boggess"), a licensed clinical social worker, testified she first became involved with Mother and the Children on August 30, 2005, due to issues involving parent separation, the Children witnessing domestic violence, and some of the Children acting out sexually. During the course of therapy, Ms. Boggess told Mother she should not leave the Children unsupervised due to their acting out sexually; however, Mother continued to leave the Children unsupervised. Ms. Boggess also testified that some of the Children reported Mother would bring various men into the home, and were aware that Mother engaged in sexual activities with some of those men.

Ms. Boggess did not have any contact with the Children between August 2006 and November 21, 2008, on which date Mother came in seeking services for

---

**3.** All five children were placed in the home of Mother's sister and brother-in-law, who have indicated a willingness to adopt all the Children. Several of the children had lived off and on with this family over the years—K.M.S. lived with this family for two years from 2004 through 2006.

T.L.B. Ms. Boggess' next contact with all of the Children was after their removal in December 2008. She continued seeing the Children through March 2009.

Ms. Boggess testified that during individual therapy, the Children complained of Mother's lack of involvement with them when they were home as Mother would spend significant periods of time sleeping, on the phone, or on the computer. The Children complained of a lack of food to the point their school provided food for the family.

Ms. Boggess stated caseworker Korrie Kirk requested she sit in on the family therapeutic visits between Mother and the Children. These visits occurred from December 17, 2008 until March 10, 2009. Ms. Boggess testified that on March 18, 2009, she made the recommendation that family therapy be suspended until such time as Mother was able to make progress in individual therapy. Ms. Boggess testified there were things happening in the family sessions that outweighed the positives of Mother and the Children having physical contact. Specifically, "there were a lot of boundary stuff going on, phone on, the taping[,] . . . the video camera[,] . . . [and] the dirty looks that [Mother] was giving [Ms. Kirk] the caseworker . . . that bothered [the Children]. Ms. Boggess stated that during the time she worked with the Children, she had no problems working with Ms. Kirk and believed Ms. Kirk's goal was to reunite the Children with Mother.

Ms. Boggess concluded that at the time she ended her work with the family in March 2010, she did not feel Mother could parent the Children due to Mother's continuing poor decisions and failure to make progress in therapy and parenting. Specifically, Ms. Boggess was concerned with parentification of the older children due to Mother requiring them to care for the younger children, and that the older children had expressed concern that Mother would not make the right choices, keep them safe, and provide for them. Ms. Boggess reported that the Children were making "good progress" out of the care of Mother.

Ms. Kirk, the caseworker from Missouri Baptist Children's Home, Children's Family Ministries ("MBCH"), testified she was assigned the case on December 9, 2008, and she was the family's only caseworker up to the date of hearing. Ms. Kirk testified that the initial case goal was reunification and the issues that needed to be addressed to meet the reunification goal included Mother's mental health issues and the need for therapy, along with Mother's parenting issues and relationship issues. To assist Mother in working on those issues, a treatment plan was prepared on January 13, 2009.

As part of the plan, Mother was to cooperate and maintain contact with MBCH, update Ms. Kirk weekly as to progress on tasks and goals, and report any changes in address and employment or household composition within "45–48 hours of the change." Ms. Kirk testified that Mother was not consistently cooperative. Mother did not always keep MBCH up to date as to her living arrangements. Mother was involved with an individual named "Jeremy" and was apparently living with him, but was not forthcoming with that information.[4] Mother also did not inform Ms. Kirk when she lost her job at the Manor at Elfindale, when she temporarily moved out of state, when she returned to Missouri, or the fact that after her return, she would be

4. When confronted, Mother first denied Jeremy was residing with her, but when presented with a police report of an incident occurring at Mother's home regarding Jeremy, Mother admitted Jeremy had been living with her.

living with "her fiancé." Mother consistently refused to provide a phone number.

Mother generally was cooperative in signing release-of-information forms. Mother made herself available for psychological testing; however, Mother did not inform MBCH that she had independently scheduled an evaluation. Ms. Kirk testified that since no substance abuse issues existed, Mother was not asked to attend treatment or submit to drug testing. Mother provided verification of completion of parenting classes.

Mother generally maintained visits when available. At the first visit on December 12, 2008, Mother was very hostile. Mother was 25 minutes late, wanted to talk to the Children about her hospitalizations and other case-related information, and spoke on her cell phone several times. Ms. Kirk eventually had to end the visit due to Mother's behavior in continuing to antagonize the Children and "getting them riled up." Ms. Kirk testified that Mother was continually antagonistic towards her and that one particular encounter was "pretty extreme . . . in my face[.]" Ms. Kirk initially supervised the visits until she requested Ms. Boggess' involvement in January or February 2009. However, due to the chaotic nature of the visits, Ms. Boggess requested that Ms. Kirk continue to sit in on the visits to help. In April 2009, after a visit where Mother brought the Children's cats—which only served to upset the Children—and Mother was found to be secretly audio-taping and videotaping the visits, the visits were suspended. Before the visits could continue, Mother's then treating therapist, Dr. Robert Gladden, felt Mother "needed to deal with some issues." In October 2009, supervised visits resumed.

Ms. Kirk further testified that Mother was ordered to pay $100 per month in child support, but Mother did not pay support and refused to accept delivery of documentation from child support enforcement. Since losing her last-known job at the Manor at Elfindale, Mother did not provide verification of employment or verification of any other source of steady income. Mother was relying on her fiancé for full support.

As part of the treatment plan, Mother was to complete anger management classes and was reportedly continuing to receive treatment on issues of anger management at the time of trial.

In recommending termination of parental rights, Ms. Kirk noted that the ongoing barriers to reunification included lack of trust between Mother and the older children, an ongoing inability to financially and emotionally support the Children, and Mother's failure to internalize change and address her mental health issues.

Because Mother's mental health was a significant issue in the case, a number of mental health professionals testified regarding psychological evaluations completed by Mother and her participation in treatment and counseling.

Dr. Usha Manusmare ("Dr. Manusmare"), a psychiatrist at Burrell Behavioral Health, testified she had been seeing Mother from June 6, 2007, up to the time of trial, for medication management of her depression and anxiety. Dr. Manusmare was working with Mother under an Axis I diagnosis of "major depression recurrent, currently minor to moderate degree, panic disorder without agoraphobia, generalized anxiety disorder, obsessive compulsive disorder[,] and . . . eating disorder." Mother was diagnosed under Axis II with "personality disorder [NOS]."

Dr. Manusmare testified that on December 2, 2008, Mother contacted her office for an appointment and spoke with her nurse expressing suicidal ideations. Moth-

er told the nurse that the Division of Family Services ("DFS") was "in war with the family," "were mistaking her," and she needed to come in and talk about her stressors. Mother stated she was losing her mind and talked about committing suicide after killing all five of her children if DFS removed them from her care. Mother also stated she had great admiration for the Florida woman who killed herself and her children and that the Children "don't have to live in this evil world."

On December 3, 2008, Dr. Manusmare met with Mother and encouraged Mother to check herself into the hospital. Dr. Manusmare testified that during this time, Mother was on medication and had been under her treatment for the past 18 months. Dr. Manusmare testified that it concerned her that after 18 months of treatment, Mother was still expressing suicidal ideations. Dr. Manusmare testified that in November 2009, Mother also expressed "conditional suicidal statements"; i.e., "she was saying if I don't get my kids, I might hurt myself."

Dr. Mark Bradford ("Dr. Bradford"), a clinical psychologist, evaluated Mother on January 7, 2009, and again on August 23, 2010. Dr. Bradford testified that in the first evaluation, he diagnosed Mother on Axis I as suffering from a "mood disorder, rule out bipolar disorder[;] . . . panic disorder without agoraphobia[;] . . . [and] [r]uled out [post-traumatic syndrome]." On Axis II, Dr. Bradshaw's primary diagnosis was "mixed personality with strong narcissistic histrionic borderline traits[;] . . . rule out borderline personality disorder." Dr. Bradford explained that Axis I diagnoses can pass, while Axis II diagnoses usually are permanent as they are resistant to change. Dr. Bradford also recommended Mother receive counseling from a therapist who would confront Mother's irrational thinking and immature behaviors as Mother would in all likelihood have difficulty with any therapist who disagreed with her.

Upon re-evaluation on August 23, 2010, Dr. Bradford reported that Mother did not seem to be much better and other than being more careful about what she said, Mother seemed to be "gathering information to attack back[,] . . . rigidly believe[s] she's right and the world is wrong[,] . . . [and] she's a great mother in her mind." Dr. Bradford's new modified diagnosis for Mother included anxiety disorder, panic disorder, and a "big" borderline personality disorder. Dr. Bradford testified that to address these issues—as there is no medicine that really solves borderline personality disorder—Mother would need to acknowledge her issues, be willing to change, and involve herself in intensive counseling. When asked about the impact of Mother's condition upon her ability to parent the Children, Dr. Bradford testified it would be problematic for the Children to be raised by Mother as Mother's maladaptive behaviors and issues could be patterned by the Children as they got older. Dr. Bradford reported stress would be a significant issue in Mother's condition. In terms of a long-term prognosis, Dr. Bradford noted that between the time he had first seen Mother, and the date of the updated evaluation, she had been involved in therapy, was under the care of a psychiatrist, and was taking medication—yet, Mother was continuing to have the same issues.

Mother also attended therapy with Dr. Robert Gladden ("Dr. Gladden"), a therapist and counselor, from January 22, 2009 through April 28, 2009. Dr. Gladden testified he found Mother to have issues with anger and feeling mistreated, and that she had a number of conspiratorial thoughts. Dr. Gladden testified that initially he felt Mother's anger could have been situational, but she was never able to move on. Dr.

Gladden stated that Mother could never separate her issues of anger and distrust from the issues she needed to work on. Dr. Gladden attempted to work with Mother on accepting that she had made mistakes and she was personally responsible for those mistakes, but Mother never acknowledged any issues in her parenting or problems that had led the Children to be placed in or remain in care.

Dr. Gladden testified that Mother had such "severe paranoid ideations regarding all outsiders and a belief system that totally disregard[ed] fact and reality." Dr. Gladden noted he never saw Ms. Kirk engage in any counterproductive behavior regarding Mother. He testified Ms. Kirk expressed to him her concern that she could not get beyond Mother's doubts and suspicion or Mother's thinking that Ms. Kirk was "out to get her." Dr. Gladden saw this as the "main roadblock" in Mother's treatment and that Mother's "fears and her distrust was so enormous" that in the four months he worked with Mother, he was unable to make any progress.

Following his last session with Mother, Dr. Gladden was forced to sign a 96–hour involuntary commitment due to a hostile and suicidal phone call from Mother. He observed Mother later at the hospital and she was assaultive, bombastic, loud, and argumentative with law enforcement. Dr. Gladden felt that Mother's prognosis for change was poor due to her failure to accept any responsibility or show any remorse.

Dr. Pamela Forsyth ("Dr. Forsyth"), a licensed psychologist, provided services to Mother from September 9, 2009, up to the date of trial. Dr. Forsyth testified that in her opinion, Ms. Kirk had a "vendetta" against Mother and that MBCH was willing to do anything to terminate Mother's parental rights. Dr. Forsyth stated there was no working relationship between Mother and Ms. Kirk which had been problematic. After a year's worth of therapy, Dr. Forsyth described Mother's relationship with Ms. Kirk as "unhealthy" and "thwart[ing] any progress" and that Mother could not "rise above it" because Mother felt mistreated.

Dr. Forsyth's assessment was that Mother was most likely suffering from bipolar II disorder and borderline personality disorder. Dr. Forsyth testified that the main issue she addressed with Mother was anger management. She felt Mother made "very good progress" on that issue. Dr. Forsyth also noted that Mother showed remorse for her past behaviors and was beginning to accept responsibility for them.

Dr. Forsyth testified she conducted family therapy with Mother and the Children for three months. Dr. Forsyth subsequently stopped conducting family therapy because T.L.B. and M.K.S. told Ms. Kirk they were uncomfortable with Dr. Forsyth as their therapist because she was Mother's therapist.

Dr. Forsyth stated that her diagnosis had changed during her year of therapy with Mother and she did not see Mother as a full-blown personality disorder, but borderline with borderline traits. She concluded that Mother did not exhibit any type of danger or safety risk to herself or the Children, and she did not think Mother suffered from any type of mental illness that would prevent her from parenting the Children.

Ann Conn ("Ms. Conn"), a licensed clinical social worker, testified she began working with T.L.B. and M.K.S. in December 2009, and with the other children, Mother, and one of the fathers in the spring of 2010. She testified that with the exception of K.M.S., who wanted to return to the care of Mother, none of the other children

desired to reunite with Mother but did want to maintain contact with her. Ms. Conn testified she had worked with Ms. Kirk throughout the case and neither Ms. Kirk, nor MBCH had done anything to prevent reunification of Mother and the Children. Ms. Conn testified that the Children were not emotionally or mentally prepared to be placed back with Mother as things stood and there were still some safety concerns. Ms. Conn testified that she believed it to be in the best interest of the Children to stay together in a stable environment.

Dr. Phillip Mothershead ("Dr. Mothershead") testified that Mother appeared at his office in August 2010 for a psychological evaluation. Mother paid for the evaluation, but would not sign any releases allowing Dr. Mothershead to speak with or get information or records from Mother's past providers of medical or psychiatric treatment. Dr. Mothershead testified that his evaluation was limited to information he was provided by Mother, and that the results may have differed had he been provided with information from other sources. Dr. Mothershead reported it would have been helpful to have information regarding Mother's previous hospitalizations, counseling reports, etc. Dr. Mothershead diagnosed Mother as suffering from depressive disorder in remission, anxiety disorder, panic disorder, and some dependent personality traits.

When Dr. Mothershead asked Mother the reason for placement of the Children in care, Mother reported it was a culmination of events transpiring over the last six years, and that the Children had remained in care because three previous therapists had been working against her in reuniting with her children and she did not trust them. Dr. Mothershead initially reported that he did not believe Mother would pose a threat to the Children. However, in response to the trial court's hypothetical question that had Dr. Mothershead been provided with additional information, including the occasion when Mother drove the Children into the garage and left the Children in the car, would his opinion have been different, Dr. Mothershead stated it would have changed his opinion as it pertained to the "chronicity" of Mother's condition. Dr. Mothershead further testified that for any mental health treatment to be effective, a person would need to recognize they have a problem and have a "basic underlying acceptance that this is a chronic condition ... require[ing] ongoing management and treatment on a regular basis." He testified Mother would need consistent treatment to manage her chronic condition and Mother's condition could be exacerbated by stressors.

Mother testified on her own behalf. In terms of some of the incidents that had been discussed by previous witnesses, Mother stated she had left the Children alone because one was sick and she could not miss additional work as she was on probation. She admitted to pulling into the garage with the Children on one occasion when she was depressed and leaving the motor running. She denied making statements wherein she threatened to harm the Children. She stated the incident where she ran the railroad crossing and caused the injuries to T.L.B. was an accident. In terms of the December 2008 hospitalization, Mother stated she was having suicidal thoughts. Mother testified that she had been compliant with psychiatric orders for the past three years. Mother testified that once one has suicidal thoughts, those thoughts are always there and it is just a matter of controlling them. Mother also testified she had issues with Dr. Gladden because he wanted her to admit wrongdoing when she had done nothing wrong. Mother further testified she did not believe the Children needed to

come into care to begin with as she felt safe to parent them, nor did she believe that the Children should have been in care the past two years.

Mother testified she was engaged to a man named "Harry" with whom she was living and who was providing 100 percent of her support. It was subsequently determined that between the first day of trial, and the last day of trial, the parties separated due to Mother alleging Harry to be in possession of child pornography.

Upon the conclusion of evidence, the trial court took the matter under advisement and ultimately entered orders terminating the parental rights of Mother. Mother timely filed her notices of appeal.

■■■ Mother presents four points for our review: (1) the neglect finding, based on Mother's mental condition, was against the weight of the evidence; (2) the neglect finding, based on Mother's failure to provide, was not an issue until the termination petition; (3) the failure to rectify finding was erroneous because of Mother's substantial progress; and (4) the best interest finding was an abuse of discretion.[5] Our resolution of Mother's first and fourth points is dispositive.[6]

### Standard of Review

■■■ Whether a statutory ground for termination has been proven by clear, cogent and convincing evidence is reviewed under the standard set forth in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). We will affirm the trial court's judgment terminating a parent's parental rights unless no substantial evidence supports it, it is contrary to the weight of the evidence, or it erroneously declares or applies the law. *In re P.L.O.*, 131 S.W.3d 782, 789 (Mo. banc 2004).

■■■ A trial court's best interest determination must be based on a preponderance of the evidence. *In the Interest of D.M.B.*, 178 S.W.3d 683, 689 (Mo.App. S.D. 2005). "We review this finding under an abuse of discretion standard." *Id.* at 689–90. The trial court's discretion is abused "'when it is so clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration.'" *Id.* at 690 (quoting *In re E.D.M.*, 126 S.W.3d 488, 497 (Mo.App. W.D.2004)).

■■■ "In our review, we are mindful that the [trial] court was in a superior position to judge the credibility of the witnesses and that it was free to believe all, part, or none of the witnesses' testimony." *In re B.C.K.*, 103 S.W.3d 319, 322 (Mo.App. S.D.2003). Conflicting evidence is viewed in the light most favorable to the trial court's determination. *In re C.A.M.*, 282 S.W.3d

---

5. We note that Mother's brief fails to comply with Missouri Court Rule 84.04 (2011) and that this failure constitutes grounds for dismissal. Rule 84.04(c) provides, "The statement of facts shall be a fair and *concise* statement of the facts *relevant* to the questions presented for determination without argument." (emphasis added). "These requirements regarding the statement of facts section of an appellant's brief serve to define the scope of the controversy and afford the appellate court an immediate, accurate, complete, and unbiased understanding of the facts of the case." *Stickley v. Auto Credit, Inc.*, 53 S.W.3d 560, 562 (Mo.App. W.D.2001). Here,

Mother's Statement of Facts consists of *87 pages* focusing largely on irrelevant testimony to the issues on appeal. Nevertheless, because we are able to sufficiently discern the facts of the case, we review Mother's appeal on the merits.

6. Sufficient evidence of one ground is all that is needed to affirm a termination of parental rights; in such a situation, as here, it is unnecessary to address any remaining grounds. *See In re A.M.C.*, 87 S.W.3d 917, 923 (Mo. App. S.D.2002).

at 405. "The termination of parental rights is an awesome power that involves fundamental liberty interests associated with family and child rearing"[;] therefore, "we review the record very closely to ensure this awesome power was properly exercised." *In re L.M.*, 212 S.W.3d 177, 181 (Mo.App. S.D.2007) (internal citation omitted). "Statutes that provide for the termination of parental rights are strictly construed in favor of the parent and preservation of the natural parent-child relationship." *In re K.A.W.*, 133 S.W.3d at 12.

## I. Ground for Termination

First, Mother argues the trial court's finding that Mother's mental condition is either permanent or has no reasonable likelihood of being reversed and renders her unable to provide the Children with the necessary care was against the weight of the evidence. We disagree.

▮ "Weight of the evidence" means its weight in probative value, not the quantity or amount of evidence. *In re K.K.*, 224 S.W.3d 139, 149 (Mo.App. S.D. 2007). It is not determined by mathematics, but depends on its effect in inducing belief. *Id.* " 'We exercise extreme caution in considering whether a judgment should be set aside on the ground that it is against the weight of the evidence, and will do so only upon a firm belief that the judgment was wrong.' " *Id.* (quoting *In re D.M.S.*, 96 S.W.3d 167, 171 (Mo.App. S.D. 2003)).

Here, Mother challenges this ground as being against the weight of the evidence, but fails to set forth a viable against-the-weight-of-evidence argument as she merely sets forth selective evidence contrary to the trial court's finding while ignoring favorable evidence and the trial court's credibility determinations. *See Houston v.*

*Crider*, 317 S.W.3d 178, 187 (Mo.App. S.D. 2010) (an against-the-weight-of-the-evidence argument requires completion of four sequential steps: (1) identify a challenged factual proposition; (2) identify all of the favorable evidence supporting the proposition; (3) identify evidence contrary to that proposition, resolving all conflicts in testimony in accordance with the trial court's credibility determinations; and, (4) demonstrate why the favorable evidence, along with the reasonable inferences drawn from that evidence, is so lacking in probative value, when considered in the context of the totality of the evidence, that it fails to induce belief in that proposition). Nevertheless, we note *infra* that a review of the record as a whole reveals ground for termination of Mother's parental rights has been proven by clear, cogent, and convincing evidence and Mother's sub-points are without merit.

▮ In determining whether to terminate parental rights, based on abuse or neglect, the trial court considers four factors, including whether the parent has a mental condition that renders the parent unable to care for the child that is unlikely to improve in the future. § 211.447.5(2)(a).[7] The statute requires the court, in determining whether to terminate under that subdivision, to consider and make findings as to four factors; however, a termination based on abuse may be justified by the existence of only one factor. *In re T.M.E.*, 169 S.W.3d 581, 585 (Mo.App. W.D.2005).

▮ "A parent's mental condition can support termination of parental rights, but only if it rises to the level described under the statute." *In re S.M.H.*, 170 S.W.3d 524, 533 (Mo.App. E.D.2005). "This provision requires a showing of more than merely the presence of mental or emotional instability or problems; the in-

---

7. All references to statutes are to RSMo Cum. Supp.2009, unless otherwise indicated.

capacity must be so severe that it renders the parent incapable of providing minimally acceptable care and the condition cannot be reversed or improved in a reasonable time." *In re S.M.H.*, 160 S.W.3d 355, 371 (Mo. banc 2005). A mental or emotional condition must be analyzed in three prongs to make an adequate finding:

> (1) documentation—whether the condition is supported by competent evidence; (2) duration—whether the condition is permanent or such that there is no reasonable likelihood that it can be reversed; and (3) severity of effect— whether the condition is so severe as to render the parent unable to knowingly provide the child necessary care, custody or control.

*K.A.W.*, 133 S.W.3d at 14. "[A]buse or neglect sufficient to support termination under section 211.447.4(2) [must] be based on conduct at the time of termination, not just at the time jurisdiction was initially taken." *Id.* at 10.

 In applying the three-prong test, we find clear, cogent and convincing evidence supports the trial court's finding that Mother has a mental condition that has no reasonable likelihood of being reversed in a reasonable period of time, and that renders her unable to knowingly provide the Children with necessary care, custody and control.

First, Mother's mental illness was well documented as both in-depth testimony and reports were presented from various mental health professionals treating Mother. She was diagnosed with depression, panic disorder, OCD, eating disorder, personality disorder NOS with histrionic and borderline traits, mood disorder NOS, and narcissistic personality disorder.

Additionally, the evidence supports the conclusion that Mother's conditions cannot be resolved within a reasonable period of time as several mental health professionals reported little to no change in her conditions after *years* of treatment. Notably, Dr. Manusmare testified that it concerned him that after 18 months of treatment Mother was still expressing suicidal ideations. Dr. Bradford also noted Mother was continuing to have the same issues despite being involved in therapy, under the care of a psychiatrist, and taking medication. Dr. Gladden felt that Mother's prognosis for change was poor due to her failure to accept any responsibility or to show any remorse. Further, the mental health professionals were concerned Mother's mental health conditions would be exacerbated under stressful conditions. Although there may have been a modicum of evidence to the contrary, the trial court was free to believe all, part, or none of that evidence. *In re B.C.K.*, 103 S.W.3d at 322.

Finally, the evidence exemplified the severity of Mother's condition and its effect on caring for the Children and their safety. For example, even on medication and while undergoing therapy, Mother made threats to kill herself and the Children; continued to express suicidal statements; none of the Children, except the youngest, desired to be reunited with Mother; mental health professionals determined it was unlikely Mother would be able to care for a child safely and appropriately; and the older children were parentified due to Mother placing too much parenting responsibility on them.

Mother's argument specifically points to the fact that she had visitation with the Children at her home and that the visitation coordinator suggested leaving the Children at Mother's house for an hour or two unsupervised. This, however, does not negate the findings of multiple mental health and other social service professionals as to their strong concerns for Mother's ability to provide and care for the

Children; it is axiomatic that an unsupervised one-to two-hour weekly visitation would not induce the same stressors of providing more substantial parenting responsibilities for the Children.

In support of her contention, Mother also points to the fact that the medical testimony differed on the severity and prognosis of her condition and the "suicidal ideation episode report was exaggerated and was not an actual attempt to harm [her] children." Again, we must " 'give deference to the court's ability to judge the credibility of the witnesses.' " *In re C.A.M.*, 282 S.W.3d at 409 (quoting *In re J.L.B.*, 9 S.W.3d 30, 37 (Mo.App. W.D. 1999)). It was squarely within the trial court's discretion to believe all, none or some of the witnesses' testimony.

 Mother also argues that if she "was truly a threat to the lives of her children, she could have taken the easy way out and had a legal abortion." [8] This contention is illogical; we find a woman's choice not to have a legal abortion does not preclude the woman from being a threat to the lives of her children.

Because the trial court's finding of a "mental condition" under section 211.447.5(3)(c) that renders Mother unable to care for the Children that is unlikely to improve in the future was supported by clear, cogent and convincing evidence for all of the aforementioned reasons, we need not address the sufficiency of the evidence as to the other conditions pursuant to the statute. *In re J.J.B.*, 314 S.W.3d 425, 432 (Mo.App. W.D.2010). Thus, points I, II, and III are denied.

### II. Best Interest Determination

Mother also contends the trial court abused its discretion in finding it was in the Children's best interest to terminate her parental rights. After a careful review, we conclude there was no abuse of discretion in the trial court's best interest finding.

 Determining a child's best interest is a subjective assessment based on the totality of the circumstances. *In re C.A.M.*, 282 S.W.3d at 409. Section 211.447.7 provides the trial court with seven factors to consider when determining whether termination of the parent-child relationship is in the best interest of a child.[9] "There is no requirement, statutory or otherwise, that all seven of these factors must be negated before termination can take place; likewise, there is no minimum number of negative factors necessary for termination." *Id.* at 409.

---

8. Mother had a sixth child which she gave up for adoption in 2006.

9. Those factors are:
 (1) The emotional ties to the birth parent;
 (2) The extent to which the parent has maintained regular visitation or other contact with the child;
 (3) The extent of payment by the parent for the cost of care and maintenance of the child when financially able to do so including the time that the child is in the custody of the division ...;
 (4) Whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time;
 (5) The parent's disinterest in or lack of commitment to the child;
 (6) The conviction of the parent of a felony offense that the court finds is of such a nature that the child will be deprived of a stable home for a period of years; provided, however, that incarceration in and of itself shall not be grounds for termination of parental rights;
 (7) Deliberate acts of the parent or acts of another of which the parent knew or should have known that subjects the child to a substantial risk of physical or mental harm.
 § 211.447.7(1)–(7).

Here, the trial court considered and appropriately made findings as to all seven factors. Of particular significance is the trial court's finding as to factor (4) that Mother has been provided with intensive services, but she has not accepted responsibility for her circumstances or the Children. Thus, the trial court found it unlikely that services exist that would enable a return in an ascertainable period of time. To contradict this finding, Mother again points to Dr. Forsyth's testimony that Mother was accepting responsibility for her mistakes and had come a long way in trusting others. Mother conveniently ignores the fact that the trial court found Dr. Forsyth's testimony outweighed by that of Dr. Bradford and Dr. Manusmare. Specifically, Dr. Bradford felt Mother viewed herself as wronged and took no responsibility for the circumstances. He additionally noted that there was little change in Mother from the last time he saw her. Mother's own testimony further demonstrated her failure to take responsibility as she did not believe her children needed to come into care to begin with, nor did she believe they should have been in care the past two years.

Mother also notes that it was against the Children's wishes to be cut off from her. She, however, fails to acknowledge that with the exception of the youngest child, none of the Children desired to return to her care. While evidence supports the Children do love their mother, this is insufficient to protect the Children, and does not permit this Court to ignore the overwhelming evidence indicating termination is in the Children's best interest.

Additionally, Mother contends the "unexplained dismissal of the fathers' petitions clouded the issues of permanency and stability intended by the statute." Here, the trial court was deciding whether to terminate *Mother's* parent-child relationship and evaluated the statutorily mandated factors for Mother as directed by section 211.447.7.

In summary, overwhelming evidence demonstrated it was in the Children's best interest to terminate Mother's parental rights as: (1) none of the Children, except the youngest, wanted to return to Mother's care; (2) Mother did not financially provide for the Children while they were in the State's care and presented no evidence of her inability to do so; (3) Mother has received intensive services, but continues to blame others for her circumstances and multiple mental health professionals and social service providers report she has made little progress, making it unlikely that services exists that would enable a return of the Children in ascertainable period of time; and (4) the Children were making progress in their placement out of Mother's care. Viewing this evidence in the light most favorable to the trial court's judgments, we find a preponderance of the evidence supported the trial court's findings that termination of Mother's rights is in the best interest of the Children. Mother's point is denied.

We affirm the judgments of the trial court.

BATES and SCOTT, JJ., concur.