282 S.W.3d 398 (2009)
In the Interest of C.A.M.
T.F., Appellant,
v.
Greene County Juvenile Office, Respondent.
No. SD 29254.
Missouri Court of Appeals, Southern District, Division Two.
April 20, 2009.
*400 John E. Kelly, Springfield, MO, for Appellant.
William Prince, Springfield, MO, for Respondent.
*401 GARY W. LYNCH, Chief Judge.
T.F. ("Mother") appeals from a judgment terminating her parental rights to C.A.M. ("Child"), entered by the Circuit Court of Greene County. The trial court terminated her rights to Child based upon three grounds: abandonment, pursuant to section 211.447.5(1); abuse or neglect, pursuant to section 211.447.5(2); and failure to rectify, pursuant to section 211.447.5(3).[1] Mother claims first, that the trial court erred in terminating her rights to Child because such a finding was against the weight of the evidence, and second, that termination was not in Child's best interest because all of Mother's shortcomings were beyond her control. This Court affirms the judgment.

Factual and Procedural Background
We initially note that the trial transcript indicates that the juvenile officer offered ten exhibits which were all admitted into evidence. These included: exhibit 4, the deposition testimony of Mother's counselor, Marsha Ellis; exhibit 5, Dr. Bradford's psychological evaluation of Mother; exhibit 7, Mother's treatment plan with Children's Division; and exhibit 9, Children's Division's court summary related to the best-interest determination. None of these exhibits were filed in this Court as provided by Rule 81.16.[2] "When an exhibit is omitted from the transcript and is not filed with the appellate court, the intendment and content of the exhibit will be taken as favorable to the trial court's ruling and as unfavorable to appellant." In re Marriage of Gourley, 811 S.W.2d 13, 16 (Mo.App.1991) (citing Doyle v. Doyle, 786 S.W.2d 620, 621 (Mo.App. 1990)).
In reviewing a judgment terminating parental rights, this Court "consider[s] the facts and the reasonable inferences derived therefrom in a light most favorable to the judgment." In re L.N.D., 219 S.W.3d 820, 822 (Mo.App.2007) (citing In re L.R.S., 213 S.W.3d 161, 164 (Mo.App. 2007); In re L.M., 212 S.W.3d 177, 180 (Mo.App.2007)). Viewed in that context, the following evidence was adduced at trial.
Child was born April 12, 2006. Although M.M. ("Father") is named as the father on Child's birth certificate, it was later determined that Father is not Child's biological father; that individual is unknown. The trial court adjudged Father as Child's legal father, and Mother does not challenge this part of the judgment in this appeal.
On May 16, 2006, Family-Centered Services ("FCS"), a segment of the Children's Division of the Department of Social Services, became involved with the family after a newborn crisis assessment was conducted following Child's birth. The investigator who conducted the assessment requested that a FCS worker meet with the family to work on adequate housing, parenting issues, and home management. She also requested referrals for the family to Medicaid, WIC, and a variety of parenting classes. The assigned FCS worker, Glenda Griest, met with Mother during the initial meeting and at that time called a number of the agencies to which the family had been referred to begin setting up contacts.[3]
Griest was in contact with the family for approximately two months, meeting with *402 them four times before referring them to Intensive In-Home Services ("IIS"). Griest made the referral after witnessing numerous problems in the home: Mother and Father were instructed to give Child Karo syrup to treat a bowel problem but did not do so, even though the problem persisted for over a month; Griest watched Mother feed Child a "purplish-colored liquid" that Mother insisted was formula; Mother repeatedly missed scheduled meetings with parenting groups and organizations; and Child's weight dropped from the 25th-percentile to the 5th-percentile over the course of Griest's involvement. Overall, Griest felt that Mother and Father had problems following through on things, and she was worried about their ability to follow instructions if Child had a serious problem. She also found it problematic that neither parent seemed to recognize any problems with either Child or their ability to care for him.
Mother and Father were upset when Griest first discussed IIS and initially refused to participate. At that point, Griest referred the case to the Juvenile Office. During a conference there, both Mother and Father were argumentative and did not see that anything was wrong. They did not want strangers involved and insisted that Child was doing fine. Ultimately, however, they did accept help from IIS.
The family first met with IIS on June 28, 2006. Lara Chism met with both Mother and Father to construct a treatment plan that would ensure Child's safety in the home. The biggest issues presented to IIS were Child's low weight, failure to gain weight, and there being inadequate provisions for the baby in the home. Initially, Chism had the couple keep a feeding log of how often and how much they fed Child; as time progressed, however, Chism began to doubt the accuracy of the log, as Child was still not gaining weight. Chism instructed the parents on when and how much to feed Child, as well as general parenting issues, and helped the couple enroll in WIC and Medicaid to get adequate supplies. She also helped them secure a crib.
Throughout her three weeks with the family, Chism was met with resistance to both her instructions and her actual help. For example, Mother and Father were "openly aggravated" when told they would need to feed Child throughout the night and were slow to respond to Child when he was fussy. They further continued to insist that Child's weight was not a problem. IIS involvement was terminated halfway through the usual six-week program because of this resistance and Child's lack of progress.
A hotline report was made July 20, 2006, and investigated by Stacey Baker of the Children's Division. The report alleged concerns of a failure to thrive due to medical neglect. Baker visited the home to speak with Mother and Father about the reported neglect; both responded that there was not a problem with Child, that they fed him every three hours, and that they had adequate baby supplies. Both parents were visibly upset and agitated about the allegations. Baker also spoke with various support workers in the home at the time of her visit and scheduled a meeting at the Juvenile Office for the following day.
At that meeting, it was determined that Child would be taken into custody and placed into foster care. Baker noted that comprehensive services had been in the home for approximately one month without any progress, and she found that Child was failing to thrive with Mother and Father.
The Circuit Court of Greene County thereafter held a hearing on a petition alleging that Mother and Father neglected *403 Child, found the allegations in the petition to be true, and ordered specific treatment plans into effect for both individuals. The trial court in this termination proceeding, at the request of the juvenile officer and without objection, took judicial notice of the court's file in the neglect proceeding, which according to the transcript was physically in front of the termination court. Such judicial notice made the neglect file part of the record in this proceeding, and it is considered evidence before the termination court. Chandler v. Hemeyer, 49 S.W.3d 786, 792 (Mo.App.2001). The file from the neglect case, however, was not included with the legal file, nor was it filed as an exhibit or otherwise made a part of the record in this appeal by Mother. As previously noted, the omission of this evidence from the record on appeal will be taken as favorable to the trial court's ruling and as unfavorable to Mother. Gourley, 811 S.W.2d at 16.
Mother underwent a psychological evaluation by Dr. Mark Bradford in early September 2006, which consisted of both a test and interview portion. Bradford scored Mother's IQ at 55, falling in the range of mild mental retardation. Specifically, Bradford found that Mother has mental disabilities and learning problems, as well as difficulty in assimilating new information. While Bradford felt that Mother would make an adequate auxiliary caretaker in a well-functioning home, he expressed serious doubts about her ability to care for Child as the primary caretaker. He further opined that Mother may need assistance in caring for herself at times.
Father also underwent a psychological evaluation in early September. Bradford scored his IQ at 74, placing him at a "borderline intelligence" level. Bradford noted that Father's low intelligence could influence his cause-and-effect reasoning and would make him a slower learner. Bradford also diagnosed Father as having an antisocial personality disorder and an adjustment disorder. He also noted that Father is paranoid, has self-esteem issues, and has a history of irresponsibility and failing to honor obligations. Finally, Bradford opined that, based on his diagnoses and experience with Father, Father would have a difficult time accepting guidance from others and cooperating with the services necessary to acclimatize Father to properly care for Child.
Beginning in October 2006, the couple participated in counseling with social worker and therapist Susie Wampler. Wampler met with Mother and Father together at Mother's home on nine occasions. She observed that both Mother and Father had difficulty consistently identifying parenting issues with which they needed improvement or assistance. Wampler also noted that both parents had unrealistic expectations regarding Child's development, as well as significant cognitive limitations. At one point, Wampler attempted to incorporate the couple's new puppy into her parenting training, but gave up when Mother and Father were unable to demonstrate basic parenting skills to the puppy. After her last appointment, Wampler felt that Mother was unable to care for a child and perhaps unable to care for herself.
Initially, the long-term goal for the family was reunification. Mother and Father were administratively cooperative, maintaining contact with their case worker, and signing all required release forms. At first, Mother and Father were regular in their visitation with Child at the Children's Division office, which resulted in some in-home visitation during the latter part of 2006. Father and Mother provided the diapers and formula Child required during these in-home visits, and the case worker referred to such provisions as "in-kind support" for Child. Otherwise, neither Mother *404 nor Father provided any financial or other in-kind support for Child during this period.
In the early part of 2007, however, the parental visits with Child became sporadic. Their irregularity caused the scheduled visits to be relocated to the Children's Division office and reduced from two visits to one visit per week. In March 2007, Mother and Father moved to Ohio without notifying anyone beforehand. Their last visit with Child before moving was on February 20, 2007, which was the only visitation they exercised that month. Before trial, neither Mother nor Father offered an explanation for the move; at trial, Father claimed the move was an attempt to find work and reunite the family in a different jurisdiction.
While living in Ohio, neither Mother nor Father inquired about Child or his welfare other than to request phone contact with the infant, which was denied due to Child's age and inability to speak. Neither parent provided any financial or in-kind support. During the time Mother and Father were residing in Ohio, the long-term case goal was changed to termination, and the instant petition for termination was filed on August 23, 2007.
Upon the couple's return to Missouri on September 21, 2007, Mother tested positive for THC and was referred to substance abuse treatment; it is unclear whether Mother attended the treatment. Visitation with Child following the couple's return to Missouri was inconsistent, and neither Father nor Mother provided any financial support for Child other than providing a few diapers and toys during their visits with Child in October or November.
In its findings granting the petition, issued in June 2008, the trial court found three separate grounds for termination of Mother's parental rights to Child:[4] (1) Mother abandoned Child; (2) Mother abused or neglected Child; and (3) Mother failed to sufficiently rectify the underlying situation giving rise to the court's jurisdiction over Child after more than a year of treatment. The trial court further found that termination was in Child's best interest. As a corollary to its finding of abuse or neglect, the trial court determined that Mother suffers from a "mental condition that is either permanent or has no reasonable likelihood of being reversed that would render the parent unable to knowingly provide the child with the necessary care, custody and control." The trial court noted that Mother is "functionally incapacitated in terms of providing emotional support, protection, guidance and nurturance for a child." Finally, the trial court mentioned the inability of both parents to recognize any problems with either Child or their parenting abilities, even after intensive therapy. This appeal followed.

Standard of Review
On appeal, we review a trial court's decision that one or more statutory ground exists for terminating parental rights to determine whether the ruling is supported by substantial evidence, is against the weight of the evidence, or involves an erroneous application or declaration of the law. In re S.M.H., 160 S.W.3d 355, 362 (Mo. banc 2005). "We will not reverse the trial court's decision unless we are left with the firm belief that the decision was wrong." In re S.M.B., Jr., 254 S.W.3d 214, 218 (Mo.App.2008) (citing S.M.H., 160 S.W.3d at 362). We will affirm the decision of the trial court if only one statutory ground for termination was properly pleaded and proven, even though *405 more than one ground may have been found and challenged. In re A.M.S., 272 S.W.3d 305, 308 (Mo.App.2008). In reviewing a claim that termination was not in the child's best interest, we examine the record for an abuse of discretion. In re I.Q.S., 200 S.W.3d 599, 603 (Mo.App.2006). In reviewing both claims, any conflicting evidence is viewed in the light most favorable to the judgment of the trial court, In re A.S.W., 137 S.W.3d 448, 452-53 (Mo. banc 2004), and we defer to the trial court's assessments of witness credibility. In re C.F.C., 156 S.W.3d 422, 426 (Mo.App. 2005).

Discussion
In order to terminate parental rights, the trial court uses a two-step process. In re S.J.H., 124 S.W.3d 63, 66 (Mo.App.2004). First, the trial court must find by clear, cogent, and convincing evidence that one or more statutory ground for termination exists. Section 211.447.5; In re P.L.O., 131 S.W.3d 782, 788 (Mo. banc 2004). "Clear, cogent, and convincing evidence is evidence that instantly tilts the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true." S.M.H., 160 S.W.3d at 362 (citing In re A.S.W., 137 S.W.3d at 454). Such evidence may be found even though contrary evidence is before the court or the evidence might also support an alternative conclusion. S.M.B., 254 S.W.3d at 218 (citing In re A.K.F., 164 S.W.3d 149, 151 n. 1 (Mo.App.2005)). If the trial court finds at least one statutory ground for termination, it then moves to the second step and must determine if, by a preponderance of the evidence, termination of parental rights is in the child's best interest. Section 211.447.5; P.L.O., 131 S.W.3d at 789. This does not amount to merely determining that the child would be better off in another home, but rather that the child's best interest cannot be served by remaining with the natural parents. S.J.H., 124 S.W.3d at 70.
Mother presents two points for our review. We address them in the order presented.

Finding of Abandonment as Ground for Termination is not Against the Weight of the Evidence
In her first point, Mother contends that all three of the grounds for termination found by the trial courtabandonment, abuse or neglect, and a failure to rectify were against the weight of the evidence.[5] Mother gives four reasons in support of her claim, but does not specify which reason applies to which statutory ground for termination: (1) she informed her caseworker about the move to Ohio before she left, and it was explained at trial that the move was an attempt for Father to find work and for the family to be reunited in another jurisdiction; (2) no connection was made between her mental status and an inability to care for Child; (3) she provided for Child to the extent she was asked; and (4) she substantially complied with her court-ordered treatment plan and as such should still be on track for reunification.
As the existence of only one statutory ground for termination is necessary for us to affirm the decision of the trial court, In re M.D.D., Jr., 219 S.W.3d 873, *406 876 (Mo.App.2007), this Court need only address Mother's claim that the trial court's finding of abandonment is against the weight of the evidence.
"Weight of the evidence" means its weight in probative value, rather than the quantity or amount of evidence. Nix v. Nix, 862 S.W.2d 948, 951 (Mo. App.1993). The weight of the evidence is not determined by mathematics, but depends on its effect in inducing belief. Id. "We exercise extreme caution in considering whether a judgment should be set aside on the ground that it is against the weight of the evidence and will do so only upon a firm belief that the judgment was wrong." In re D.M.S., 96 S.W.3d 167, 171 (Mo.App.2003).
In re K.K., 224 S.W.3d 139, 149 (Mo.App. 2007).
The argument portion of Mother's brief on this issue does not set forth all of the evidence relevant to the abandonment ground and then proceed to explain how the unfavorable evidence is weightierof more probative valuethan the favorable evidence, as would be expected to support an "against the weight of the evidence" argument. Rather, Mother simply sets forth isolated pieces of evidence from the record viewed in the light most favorable to her position and, without any consideration of the trial court's obligation to determine credibility, then concludes, without any citation to relevant legal authority, that because of the existence of these isolated facts no abandonment occurred.[6]
Most of Mother's recited evidence is based upon Father's testimony, which the trial court was free to disbelieve based upon its credibility determination. C.F.C., 156 S.W.3d at 426. Father testified that he told his Children's Division caseworker that they were moving to Ohio in advance of their move. Yet that caseworker testified that no advance notice was given. The trial court resolved this conflict in testimony by making an implicit credibility determination in favor of the caseworker's testimony. Mother does not advance any theory or argument as to why the trial court was obligated to believe Father's testimony over that of the caseworker. Similarly, Father's testimony that the move to Ohio was an attempt for Father to find work and for the family to be reunited in another jurisdiction, advanced for the first time at trial, was subject to the trial court's belief of that testimony. The trial court was free to believe all, part, or none of that testimony. Id. The failure of the trial court to credit Father's testimony on this issue is supported in part by the lack of any corroborating evidence as to the expectation of actual employment in Ohio in advance of the move, actual employment while in Ohio, or any reasonable expectation that moving to Ohio would assist in any positive way with reunification.
*407 One of the three remaining pieces of evidence recited by Mother is actually not evidence, but rather, a conclusion that is not supported by the record. Mother claims, "After learning that Missouri would not approve an ICPC[[7]] inquiry to obtain an Ohio worker, the couple returned to Springfield." Yet, the uncontradicted evidence was that Mother was informed on July 25, 2007, that an ICPC placement could not be made, but she did not return to Springfield until September 21, 2007, almost two months later. Finally, the last two pieces of evidence asserted by Mother"[u]pon arrival in Ohio they reported their whereabouts and gave a contact number" and "[t]hey asked to be provided services in Ohio"are not of such probative value as to outweigh the substantial and overwhelming evidence that Mother abandoned Child.
Section 211.447.5(1)(b) provides in part, as relevant to this case, "The court shall find that the child has been abandoned if, for a period of six months or longer ... [t]he parent has, without good cause, left the child without any provision for parental support and without making arrangements to visit or communicate with the child, although able to do so[.]" There is substantial evidence in the record to support that Child was approximately four months old at the time he was taken into protective custody; that Mother knew the importance of maintaining, and had demonstrated the ability to actually maintain communication and visitation with Child while he was in such custody; that Mother knew, at a minimum, that Child required formula and diapers for his support; that Mother had demonstrated the ability to provide formula and diapers for Child during his visits with her and Father in the home; that when Child was approximately ten months old, Mother moved out of state without any advance notice or explanation to Child's custodian and without making any advance arrangements with the custodian for communication or visitation with or support for Child; that while out of state for the next seven months, Mother did not have any communication or visitation with Child, did not inquire as to Child's well-being, and did not provide any support for Child; that during the time she was out of state, Mother never proffered any reason or explanation for her move; and that Mother's move out of state without explanation after having demonstrated her ability to have communication and visitation with Child and to support Child while he was in protective custody gives rise to a reasonable inference that the move and her attendant failure to communicate and visit with Child and support Child for such time period was without good cause. The trial court's finding that Mother abandoned Child is not against the weight of the evidence. Mother's first point is denied.

Termination in Best Interest of Child
In her second point, Mother contends that the trial court abused its discretion in finding termination of her parental rights in Child's best interest because "the evidence proved that [Mother's] shortcomings in visitation and lack of bonding with her son, [sic] were either not her fault or were matters not under her control." We find no such error.
Mother cites three reasons in support of her argument that no substantial evidence supporting termination being in Child's best interest was presented to the trial court. First, Mother takes issue with the *408 trial court's finding that Child was bonded with his foster parents and that there was no evidence of a healthy emotional bond between Child and Mother. She argues the only explanation for such an occurrence is that her visitation with Child was limited by the Children's Division to one hour per week and spending more time with Child was beyond her control. To the contrary, the record indicates that Mother was initially given more time with Child, but her visitation schedule was cut to once a week after she missed several visits. Furthermore, Mother fails to mention or consider the fact that she voluntarily placed herself in a position where she could not communicate or visit with Child for a seven-month period. This absence occurred during the time period when Child was approximately ten months old until he was seventeen months old, which is a critical developmental period during which a child would be expected to naturally and normally bond closely with his caregivers.[8] Apparently, Mother ignored or failed to recognize Child's developmental bonding needs when she abandoned her role as one of his caregivers during this critical time period in his life.
The record further shows that Child, while seeming to recognize Mother, did not hesitate to leave her when the time for visitation came to an end. Moreover, "[i]nvoluntary denial of custody will not preclude a finding of abandonment in all cases." In re B.S.B., 76 S.W.3d 318, 325 (Mo.App.2002). "Sometimes, the evidence may demonstrate that a parent's lack of involvement may go beyond what is attributable to the estrangement and discouragement caused by the enforced separation[.]" In re B.B.B., 905 S.W.2d 118, 121 (Mo.App.1995). Such is the case here, where Mother voluntarily absented herself from Child for seven months at a very critical stage in his development.
Mother states the trial court's finding that her visits with Child were sporadic "does not speak to the child's best interests in futuro"; she does not, however, point to any evidence before the trial court indicating that the sporadic nature of her visits would change if she were allowed to continue toward reunification with Child. Her assertion that during visits she was appropriately affectionate to her son does not alter the fact that those visits were few and far between, primarily due to Mother's own volition. Her affection for Child, likewise, does nothing to indicate a strong bond on the part of Child; it speaks only to Mother's ability to outwardly show affection for her son. Contrary to Mother's position, a lack of bonding is substantial evidence supporting that termination is in the best interest of the child, particularly when taken in conjunction with other factors supporting termination, as is the case here. Section 211.447.7(1); see In re J.L.B., 9 S.W.3d 30, 36 (Mo.App.1999).
Mother next argues that the trial court's finding that she provided no financial and in-kind support to Child while he was in foster care was unsupported by the evidence. She notes that several witnesses mentioned that she provided "in-kind items" for her son. First, Mother misstates the finding of the trial court. It did not find that Mother provided no assistance *409 whatsoever; rather, the trial court found that Mother "did not consistently provide even minimal financial or in-kind support." (Emphasis added). Second, a detailed review of the five separate references listed by Mother as evidence of her allegedly plentiful in-kind support reveals five discussions of only two instances: first, Mother provided some diapers and formula during the fall of 2006 when visitations took place in her home; and second, Mother brought diapers and a toy for Child during either an October or November 2007 visit. It is reasonable for the trial court to have found that two instances of providing formula, diapers, and a toy for her son over the course of more than a yearwith one of those instances taking place in her own homeare not consistent in-kind support. It is within the discretion of the trial court to attach little or no weight to such efforts. Section 211.447.8; B.S.B., 76 S.W.3d at 326-27.
Finally, Mother contends that the trial court's express finding that Mother articulated an interest and commitment to Child should counter "much of the negativity that was placed in evidence against her." This positive finding Mother points to was made by the trial court as one of seven required findings under section 211.447.7, as are the other two findings discussed supra in which Mother challenges the trial court's best-interest determination. There is no requirement, statutory or otherwise, that all seven of these factors must be negated before termination can take place; likewise, there is no minimum number of negative factors necessary for termination. Rather, a finding that termination is in the child's best interest is a subjective assessment based on the totality of the circumstances. G.J.R.B. ex rel. R.J.K. v. J.K.B., 269 S.W.3d 546, 554 (Mo.App.2008). While circumstances in this case are devoid of most, if not all, of the intentional and nefarious actions that all too often accompany termination proceedings, such omission does not change or minimize the totality of the circumstances supporting Mother's inability to effectively parent Child. Her love for her son is not in question, but her inability to properly address his needs is apparent from this Court's careful review of the record.
Ultimately, we must view the evidence in the light most favorable to the trial court's judgment, and we must "give deference to the court's ability and opportunity to judge the credibility of the witnesses[.]" J.L.B., 9 S.W.3d at 37. In that light, there is ample substantial evidence to support the trial court's finding that termination is in Child's best interest, and the trial court did not abuse its discretion in making such a finding. Mother's second point is denied.

Decision
The judgment of the trial court is affirmed.
PARRISH, J., and RAHMEYER, J., concur.
NOTES
[1] All statutory references are to RSMo Cum. Supp.2004, unless otherwise indicated.
[2] All references to rules are to Missouri Court Rules (2008).
[3] Initially, Mother lived alone with Child, and Father came to visit Mother often. Eventually, Father and Mother did move in together, but it is unclear exactly when that happened.
[4] In addition to terminating Mother's and Father's parental rights, the trial court also terminated the parental rights of Child's unknown biological father.
[5] Multiple claims of error in one point relied on renders the point multifarious and therefore a violation of Rule 84.04. Generally, multifarious points preserve nothing for appellate review and are ordinarily subject to dismissal. In re E.A.C., 253 S.W.3d 594, 600 (Mo.App.2008). Because of the gravity of terminating parental rights, however, we will address ex gratia the merits of the point.
[6] Mother's argument on this issue consists of the following paragraph, in toto:

What appeared at first glance to be an act of flight or abandonment to the State of Ohio by the young couple, became explicable when testimony developed that [Mother] and [Father] were seeking work, and were hoping that another jurisdiction would allow them to have [Child] with them, "just like" [Father's] sister had been able to do from-Springfield-to-St. Louis (T. 296, 320). Before traveling to Ohio they told their worker (T. 298). Upon arrival in Ohio they reported their where-abouts and gave a contact phone number (T. 207, 208). They asked to be provided services in Ohio (T. 206, 224-225). After learning that Missouri would not approve an [Interstate Compact on the Placement of Children] inquiry to obtain an Ohio worker, the couple returned to Springfield (T. 206). Upon their return, they re-contacted their worker and resumption [sic] of local services (T. 298). Appellant respectfully offers that the trip to Ohio did not amount to abandonment of their child.
[7] Interstate Compact on the Placement of Children. See section 210.620, RSMo Cum. Supp.2007.
[8] While there was no evidence in the limited record on appeal provided by Mother supporting the critical nature of this stage in Child's development, exhibit 9, Children's Division's court summary related to the best-interest determination, which as previously noted was not filed by Mother in this appeal, must support this conclusion because Child's guardian ad litem argued the critical nature of this time period in Child's development during her closing argument. Mother did not make any objection that this argument was not supported by the evidence.