342 S.W.3d 353 (2011)
In the Interest of: K.M.W., Minor,
Greene County Juvenile Office, Petitioner-Respondent,
v.
B.D.W., Natural Father, Respondent-Appellant.
No. SD 30885.
Missouri Court of Appeals, Southern District, Division One.
June 1, 2011.
*355 M. Elise Branyan Barker, Springfield, MO, for Appellant.
Bill Prince, Springfield, MO, for Respondent.
DON E. BURRELL, Judge.
B.D.W. ("Father"), the biological father of K.M.W. ("Child"), appeals the portions of a judgment that terminated his parental rights to and over Child.[1] The judge of the juvenile division of the circuit court ("the trial court") found that Respondent had proven by clear, cogent and convincing evidence the following grounds for termination: 1) abandonment, see section 211.447.5(1)(b); abuse/neglect, see section 211.447.5(2); and failure to rectify, see section 211.447.5(3).[2]
We must affirm the judgment if any one of these three statutory grounds was sufficiently proven and the trial court did not abuse its discretion in determining that termination was in Child's best interest. Section 211.447.5; see In re A.M.C., *356 87 S.W.3d 917, 923 (Mo.App. S.D.2002) (if evidence supporting one ground is sufficient to terminate parental rights, it is unnecessary to address challenges to other grounds).
Liberally construing Father's three points of alleged error, he asserts that: none of the trial court's findings were supported by sufficient evidence or they were against the weight of the evidence; and the trial court abused its discretion in finding that termination was in Child's best interest.[3] We disagree and affirm the judgment insofar as it terminates Father's parental rights.

Facts and Procedural Background[4]
Child was born in August 2008, after Mother was transported to the hospital from the county jail. Mother was in custody awaiting trial on charges of first-degree robbery and armed criminal action. The trial court took judicial notice of criminal files evidencing Mother's prior convictions for resisting arrest, possession of drug paraphernalia, and third-degree assault. No father was listed on Child's birth certificate, and Father had not claimed parentage of Child by providing his name to the Putative Father Registry. Mother named Father as Child's father, and said that he *357 was also incarcerated. Father later agreed to submit to DNA testing that confirmed Father's paternity. Because Mother had made no provision for Child's care, Child was taken into protective custody shortly after her birth.
A day-or-two after Child was born, Penny Kreitzer, an alternative care caseworker for the Children's Division of the Missouri Department of Social Services (the "Children's Division"), met with Father at the Greene County jail. Father told Kreitzer that he and Mother were both in jail on first-degree robbery and armed criminal action charges. Father also told Kreitzer that he "wanted to be involved in [Child]'s life." Kreitzer testified that, even though Child was an infant, Father was expected to have contact with Child by sending her cards or letters. Father sent no cards or letters while Kreitzer had the case.
Magevney Strickland took Kreitzer's place as the alternative care caseworker in October 2008. As she was preparing to move away from the area, her deposition testimony was taken in January 2010 and later admitted as evidence at trial. Father asked Strickland if he could have visits with Child. Strickland told him that he could not have visits because "the team did not agree with taking [Child] to the jail to see him." Strickland also testified that "to [her] knowledge" "the team's" decision would not have been any different if Father had asked again for a visit and that was "made pretty clear to [Father]." The record is devoid of any evidence that Father made any other request to be allowed to see Child, either of the trial court or the Children's Division.
Father sent a letter to Child in August 2009, and Strickland testified that the letter was appropriate. Due to Child's age, Strickland kept the letter in her file for potential future use. Father also sent a book that he made at the jail to Child as a Christmas present in 2009. Strickland testified that other than the book, Father provided no financial support, in-kind items, or other gifts to Child during her tenure on the case. Although Father was encouraged to send additional letters to Child, he never did so. Father also did not provide any names or contact information when Strickland asked Father for information about his family members. Strickland testified that based on her understanding of Father's situation and his lack of plans as of January 2010 for meeting his housing and other needs when he was eventually released from custody, she did not believe there was any likelihood that Father would be able to care for Child in the foreseeable future.
Dee Stephenson became the caseworker in May 2010.[5] By that time, Father had entered a guilty plea to the lesser-included crime of robbery in the second degree, a class B felony. Father received a 10-year sentence and was transported to the Missouri Department of Corrections ("DOC") to serve it. The trial court took judicial notice of the criminal file that documented Father's convictions for robbery and armed criminal action.[6] At the time of trial, Father had been in DOC for approximately six months. Prior to that, he had been in the Greene County jail for approximately *358 two-and-a-half years. Child has never seen Father and does not know who he is.
Stephenson recalled that she found some drawings and a card from Father to Child in the case file when she assumed the case, and she sent them to Child's foster parents. Stephenson also testified that Father had signed Child up to receive a learning newsletter available through DOC, and one came to Stephenson just before the termination trial. Father took advantage of multiple classes and programs available to him at the Greene County jail,[7] requested photos of Child (which were provided to him), and maintained at least "minimal contact" with his caseworkers.
Father was present at trial and testified on his own behalf. Father testified that he had received money while in DOC from both his mother and a girlfriend. Father said that he did not provide Child with any financial support out of those funds because $68 went toward a required victim-compensation payment. Father said he did arrange for a free initial issue or lesson of a newsletter about learning to be sent to Child. Father testified that he "should be out [of DOC] within the next year and half [sic]. That's where my percentage is at." Father believed he would serve "either 36 or 40 percent" of his sentence before he could be paroled. Father acknowledged that he had never seen Child and that under a "best case scenario" she would be three years old when he was released from DOC. Counsel for Respondent then asked Father the following questions and received the following responses:
Q. And you think it's fair that [Child] wait around?
A. Yes, I do.
Q. Why is that?
A. With her sisters and brothers, so she can go onto [sic] college, just like her sisters and brothers.[[8]]
Father said he planned on moving back to Springfield when he was released from DOC but would then move to Kansas City, where his brother "has a couple [of] businesses that he wants me to start with him[.]" Despite the preliminary nature of the brother's business plans, Father believed that his brother already had "a place and job situated for [Father]." Father also testified that he had "a stable place" for Child with a girlfriend who was helping him while he was incarcerated. Counsel for Respondent asked Father, "[Child] doesn't know [the girlfriend] from anybody, does she?" Father's response was, "[Child] don't know nobody. She's been in the foster home."[9] Child has been in a stable foster placement since August 2009, and that family is willing to provide permanency for her.

Analysis
We will affirm the trial court's termination judgment unless no substantial evidence supports it, it is contrary to the weight of the evidence, or it erroneously *359 declares or applies the law. In re P.L.O., 131 S.W.3d 782, 789 (Mo. banc 2004). Missouri statutes "provide the various grounds for a termination of parental rights. A trial court must find the existence of at least one ground and that the termination of parental rights is in the child's best interests." In re K.A.W., 133 S.W.3d 1, 9 (Mo. banc 2004). We "must review whether the grounds for termination were supported by `clear, cogent and convincing evidence.'" Id. at 12 (quoting section 211.447.5, now renumbered 211.447.6).
In contrast to the high level of proof required to establish a statutory ground for termination, the trial court's best-interest determination is only required to be supported by a preponderance of the evidence. In re D.M.B., 178 S.W.3d 683, 689 (Mo.App. S.D.2005). "We review this finding under an abuse of discretion standard." Id. at 689-90. The trial court's discretion is abused "when it is so `clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration.'" In re E.D.M., 126 S.W.3d 488, 497 (Mo.App. W.D.2004) (quoting In re M.O., 70 S.W.3d 579, 585 (Mo. App. W.D.2002)). The determination of what is in a child's best interest is an ultimate conclusion for the trial court based upon the totality of the circumstances. In re D.L.W., 133 S.W.3d 582, 585 (Mo.App. S.D.2004).
We defer to the trial court's determinations of witness credibility, A.S.W., 137 S.W.3d at 452, and it is "free to believe all, part, or none of the witnesses' testimony." In re B.C.K., 103 S.W.3d 319, 322 (Mo.App. S.D.2003). In deference to its role as the fact-finder, conflicting evidence is viewed in the light most favorable to the trial court's determination. In re CAM., 282 S.W.3d 398, 405 (Mo.App. S.D.2009). But "[s]tatutes that provide for the termination of parental rights are strictly construed in favor of the parent and preservation of the natural parent-child relationship." A.S.W., 137 S.W.3d at 453.

Failure to Rectify
A termination based on failure to rectify may be granted when the following elements of section 211.447.5(3) are satisfied: 1) the child has been under the court's care for at least a year; and 2) the conditions which led to the child being taken into care still persist, or conditions of a potentially harmful nature continue to exist; and 3) there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home. Section 211.447.5(3) (emphasis added); see also In re B.J.K. and J.R.K., 197 S.W.3d 237, 243 (Mo.App. W.D.2006).
In making its determination, the trial court is required to consider and make findings on the following factors:
(a) The terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms;
(b) The success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child;
(c) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable *360 likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;
(d) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control over the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control[.]
Section 211.447.5(3)(a)-(d). These factors are simply categories of evidence to be considered along with other relevant evidence. And while they do not constitute separate grounds for termination in and of themselves, In re L.M., 212 S.W.3d 177, 182 (Mo.App. S.D.2007), "[p]roof of one of these factors is sufficient to support termination of parental rights." In re A.M.S., 272 S.W.3d 305, 308 (Mo.App. W.D.2008).
The trial court's findings on these factors in regard to Father were as follows. In regard to his progress on his service plan, Father maintained contact with the Children's Division (in that it was "consistently aware of [Father]'s whereabouts and circumstances"); Father "never refused to sign release of information forms"; "[Father] did not maintain consistent contact with [Child] through written communication"; "[Father] did not provide minimal financial or in-kind support"; and "[Father] provided verification of attending a parenting class, Hit No More and anger management." As to the success of agency efforts to adjust Father's circumstances to allow him to provide a proper home for Child, the trial court found that "[Father's] volitional criminal conduct put him in a position were [sic] he was unable to provide [Child] with a proper home." The trial court found no evidence that Father suffered from any hindering mental condition or "suffered form [sic] untreatable chemical dependencies."
In assessing the likelihood of future harm to Child if Father's rights were not terminated, the trial court found that "[Father] remains incarcerated and unable to care for [Child]. [Child] has no emotional relationship with [Father]." It further found that Child's needs were being met in a stable placement; no evidence showed that Father was unable "to provide at least minimal in-kind or financial support"; there was no evidence that Father "would be in a position to parent [Child] within an ascertainable period of time"; despite Father's stated interest in Child, Father "has not put himself in a position to parent [Child]"; Father was serving a ten-year sentence for armed robbery; and that Father's failure to take advantage of services meant that he "could only fail to rectify the conditions that led to the removal of [Child][.]" Despite Father's claimed desire to be involved in Child's life, the trial court found that "[Father] did not consistently engage in those things that he could do to maintain a minimal parental relationship with [Child]."
Father's precise legal challenge to these findings is unclear as the legal citations he provides in his brief are to the generic, umbrella principle that the judgment "will be sustained unless there is no substantial evidence to support it, unless it is contrary to the weight of the evidence, or unless it erroneously declares or applies the law." Thereafter, Father argues that the evidence before the trial court does not clearly, cogently and convincingly demonstrate that Father had failed to rectify the conditions that existed at the time Child was taken into care. Father does not identify whether he is making a "substantial-evidence" challenge or a "weight-of-the-evidence challenge."
The distinction is important as the analysis process differs significantly depending on which claim is being made. See Houston *361 v. Crider, 317 S.W.3d 178, 186 (Mo. App. S.D.2010). In keeping with the gravity of a termination of parental rights and the requirement that the evidence must clearly, cogently, and convincingly favor termination when considered against the evidence in opposition, we will presume Father intended to assert both challenges.
To prevail on a lack of substantial evidence challenge, the appellant must ultimately demonstrate that the favorable evidence "does not have probative force upon the proposition such that the trier of fact could not reasonably decide the existence of the proposition." Id. at 187. To prevail on a "weight-of-the-evidence challenge," the appellant must work through three steps and then finally "demonstrate why the favorable evidence, along with the reasonable inferences drawn from that evidence, is so lacking in probative value, when considered in the context of the totality of the evidence, that it fails to induce belief in that proposition." Id.
The trial court found that Child had been under its "jurisdiction" for over a year, the conditions that caused Child to be placed under its jurisdiction persisted or potentially harmful conditions continued, and there was "little likelihood that those conditions can be remedied at an early date so that [Child] could be returned to [Father] in the near future or the continuation of the parent-child relationship greatly diminishes [Child's] prospects for early integration into a stable and permanent home." According to the trial court, those unremedied conditions were Father's abandonment and neglect of Child
along with his inability to meet [Child's] emotional and financial needs now or in the foreseeable future. [Father] was incarcerated at the time of [Child's] birth, and [Father] remained incarcerated at the time of the trial. [Father] has never seen [Child] and does not know [Child]. [Father's] absence from [Child] and his lack of bond with [Child] renders him unable to care for [Child] such that [Child] could be returned to him in the near future.
Father's counsel acknowledges that Father was incarcerated at the time of Child's birth and continued to be incarcerated through the termination trial, but he argues that "the trial record does not support [Respondent's] allegations that [Father] failed to take advantage of services offered to him or that he failed to make efforts to maintain contact with the case workers and maintain a relationship with [Child]." We will necessarily focus on the trial court's findings regarding Father's ongoing incarceration and its effect on his relationship with Child as the trial court did not actually find that Father failed to take advantage of services or failed to maintain contact with his caseworkers.
A termination of parental rights based on incarceration alone is not permitted. Section 211.447.7(6); T.W.C. v. Children's Div. of Div. of Soc. Servs., 316 S.W.3d 538, 541 (Mo.App. W.D.2010). But being incarcerated "does not excuse a parent's obligation to provide the child with a continuing relationship." In re J.B.D., 151 S.W.3d 885, 889-90 (Mo.App. S.D.2004). We can certainly imagine scenarios in which a child is strongly bonded to a parent who has had a history of providing that child with appropriate care and support and is currently incarcerated but is due to be released in the near future. In such a situation, a termination based upon that temporary incarceration would certainly be inappropriate. Even less favorable surrounding circumstances may fall short of the clear and convincing evidence needed to terminate an incarcerated parent's rights, and Father cites one such case in *362 his briefIn re Z.L.R., 306 S.W.3d 632 (Mo.App. S.D.2010).
In Z.L.R., the imprisoned father was denied jail visits with his very young child, but he managed to have some telephone contact with the child[10] and "`[h]e sent a card for every holiday that there was, so probably six or seven. And he sent cards when [Child] was ill at certain times as well.'" Id. at 634 (quoting a caseworker's testimony). The father had de minimis earnings while in custody and he "sent no money, but `had giftsclothing, toys, items brought from his family on his behalf numerous times.'" Id. (quoting a caseworker's testimony). Due to his incarceration, the father "could not personally provide [the child] shelter, but he proposed willing relatives whose home studies were approved. After the [Children's] Division decided that a temporary placement change was not in [the child's] best interest, Father's relatives unsuccessfully sought a court order otherwise." Id. at 637.
Here, even though Father's caseworker asked him for information about family members, and even though Father had received funds from his mother, spoke glowingly of the accomplishments of Child's older half-siblings, and had expressed an expectation of future assistance from his brother and a girlfriend, Father provided no such contact information to the Children's Division. And although Father had received personal financial assistance from his mother and a friend, he sought no such help from them for Child's benefit.[11] Father's provision of in-kind items during Child's life was limited to one book sent at Christmas in 2009 and an issue of a newsletter geared toward learning available through DOC. Father had no contact with Child until he sent Child a letter when Child was about a year old. He later sent some drawings, a card, and possibly another letter; he also requested and received photos of Child.
Despite his claimed desire to have a relationship with Child, Father's failure to make additional attempts to see Child (such as a request directed to the trial court), his failure to provide even token support for Child,[12] and his failure to consistently write Child and/or send her drawings evidenced a disinterest in Child. By testifying that it was "fair" for Child to wait for him to be released from prison and regain an ability to support himself and her, Father evidenced an inability to *363 place Child's needs ahead of his own. His statement that Child "don't know nobody"before conceding that Child knew her foster parents and thought of their home as her ownevidenced a view by Father that Child had no identity or life apart from her biological relationship to him.
This evidence was sufficient to support the trial court's finding that Father continued to be unable to care for Child himself or even make appropriate arrangements for Child to be cared for by another. Father has no emotional relationship with Child and Child has never seen Father. This evidence sufficiently established the necessary link between Father's past and present behavior and the trial court's prediction that there was no reasonable likelihood that these conditions would change within an ascertainable period of time. And although Father did not go through the necessary analysis for a weight-of-the evidence challenge, our ex gratia weighing of the evidence favorable to Father against the evidence in favor of termination leads us to the same result.
Father contends Respondent did not prove that he could have provided more for Child than "the drawings, letters, and Christmas gift that he provided for [Child] through the Children's Division." Yet the evidence demonstrated that Father had the ability to send such letters and drawings but did not do so on a regular basis. More importantly, Father reserved for his own use the few monetary contributions he received from family and friends; he did not redirect even a token portion of them to Child.
In discussing his future, Father testified that he planned to establish himself in Springfield in order to get custody of Child but then move to Kansas City, where he intended to help his brother start various businesses. While relocation is sometimes ultimately in a child's best interests after weighing various factors, this plan tellingly lacked any consideration of Child's needs. While Father is absolutely correct that incarceration alone is not sufficient to terminate parental rights, this does not mean that incarceration may not be considered at all; in many cases, it is an extremely important factor. Here, Father's release date is uncertain and his actions (or lack thereof) while incarcerated proved that Father failed to use the services, family, and friends available to him to contribute to Child's care, custody and control.
As Respondent correctly points out, Father "was in no better position to parent [Child] on the date of trial than he was at the time [Child] was taken into custody." The trial court's failure to rectify finding was supported by clear, cogent, and convincing evidence. Father's contention that the record lacks the necessary proof of a statutory ground for termination fails.

Best Interests
The following categories of information are explicitly set forth as "best interest factors" the trial court must consider:
(1) The emotional ties to the birth parent;
(2) The extent to which the parent has maintained regular visitation or other contact with the child;
(3) The extent of payment by the parent for the cost of care and maintenance of the child when financially able to do so including the time that the child is in the custody of the division or other child-placing agency;
(4) Whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time;

*364 (5) The parent's disinterest in or lack of commitment to the child;
(6) The conviction of the parent of a felony offense that the court finds is of such a nature that the child will be deprived of a stable home for a period of years; provided, however, that incarceration in and of itself shall not be grounds for termination of parental rights;
(7) Deliberate acts of the parent or acts of another of which the parent knew or should have known that subjects the child to a substantial risk of physical or mental harm.
Section 211.447.7; P.L.O., 131 S.W.3d at 791 (construing what was then numbered as section 211.447.6).
Here, the trial court found that Child had no emotional ties to Father. Father's most recent caseworker testified that, based upon her understanding of the case, Child did not know who Father was. Father attributes his failure to bond with Child to the denial of visits by the Children's Division and its failure to forward his letters and drawings to Child. The legal file is devoid of any request by Father (who was represented by counsel) that the trial court review the Children's Division's denial of visitation or that it order any other form of contact with Child.
The record does indicate that some items were held for a time in the caseworkers' file before being delivered to Child via her foster parents. Even though we presume these items should have been delivered as soon as they were deemed appropriate, a reasonable inference from the evidence was that the letters and drawings from Father were so inconsistent that they would have been inadequate to establish a bond with Child. Sending items to a child does not guarantee a bond. See T.W.C., 316 S.W.3d at 542 ("although [the father] maintained regular contact with the children by sending drawings, letters, and gifts and by telephone when they got older, no bond exists between [the father] and the children, and the children are not even sure who he is"). If Father had consistently sent Child these items, it would have at least evidenced an intent on his behalf to create and maintain such a bond.
The trial court also found no evidence indicating that Father was unable to provide at least minimal in-kind or financial support for Child. Father rightly notes that he did not bear the burden of proof on this issue. But what he fails to appreciate is that Respondent did not attempt to prove that Father was able, while in custody, to fully support Child. Rather, Respondent proved that Father made only token efforts to provide Child with any support and failed to even attempt to draw upon resources available to him. See In re S.J.G., 871 S.W.2d 638, 642 (Mo.App. S.D. 1994) (even a parent who lacks the ability to fully support a child still has a duty to make minimal support contributions for that child).
In considering whether additional services would enable Father to parent Child, the trial court found no evidence that Father "would be in a position to parent this child within an ascertainable period of time." While less than the ideal panoply of services and referrals were available to Father while he was in custody, a reasonable inference from the evidence was that additional services were not likely to make a significant difference in Father's ability to parent Child. Father did not provide family contact information when his caseworker asked for it even though he testified that he had received help himself from family and friends and hadthrough thema "stable" place for Child to stay. This evidence, combined with Father's minimal efforts to send things to Child and his belief that Child should just "wait *365 around" for him to get out of prison, supports the trial court's finding that "[F]ather articulated an interest in [Child] but has not put himself in a position to parent [Child]."
Although the portion of the record actually provided to us is insufficient to establish that Father would continue to be incarcerated for "a period of years,"[13] he is serving a ten-year sentence for robbery and armed criminal action. In light of the nature of those convictions, and Father's testimony about his post-release plans, the trial court could determine that an immediate placement of Child with Father upon Father's release would not be in Child's best interest. See T.W.C., 316 S.W.3d at 542 ("even though [the father] was due to be released on parole within two months of the hearing, additional services such as counseling would not enable the children to be returned to him within an ascertainable period of time").
The trial court found that a "continuation of the parent-child relationship greatly diminishes [Child's] prospects for early integration into a stable and permanent home" and that Father's inability to provide proper care would be "potentially harmful to [Child] should she be returned [sic] to that environment." These findings were supported by evidence of Father's inability to care for Child paired with evidence that Child had been in a stable foster home since August 2009 and could become a permanent member of that family if Father's rights were terminated. Both Strickland and Stephenson testified that the Children's Division recommended termination of parental rights. The Guardian ad Litem also stated that termination of Father's parental rights was in Child's best interest.
The trial court's best-interests finding was in line with the logic of the circumstances before it, was not arbitrary and unreasonable, and does not shock our sense of justice or indicate a lack of careful consideration. Father's claim to the contrary fails. The judgment of the trial court, insofar as it terminates Father's parental rights, is affirmed.
BARNEY, P.J., and LYNCH, J., Concur.
NOTES
[1] The judgment also terminated the parental rights of Child's mother ("Mother"). Mother is not a party to this appeal. We express no opinion about the propriety of the trial court's termination of her parental rights and refer to evidence about Mother only as necessary to address Father's appeal.
[2] Unless otherwise indicated, all references to Chapter 211 are to RSMo Cum.Supp.2009, as amended to date.
[3] Father's first point does not identify which statutory ground is being challenged. It simply asserts that termination was against the weight of the evidence and summarizes the evidence favorable to Father. Father's second point states:

The trial court erred to the prejudice of [Father] when it determined that the allegations contained in the petition to terminate parental rights were true and that termination was in the best interest of [Child] in that there was insufficient evidence for the [trial] court to find that the evidence presented clearly, cogently, and convincingly demonstrated that [Father] had repeatedly or continuously failed, although physically or financially able, to provide [Child] with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for [Child's] physical, mental, or emotional health and development, in that there was insufficient evidence to establish that [Father] was physically or financially able to provide adequate food, clothing[,] shelter, education, or other care and control as provided by law.
Father's third point states:
The trial court erred to the prejudice of [Father] when it determined that the allegations contained in the petition to terminate parental rights were true and that termination was in the best interest of [Child] in that there was insufficient evidence for the court to find that the evidence presented clearly, cogently, and convincingly demonstrated that the conditions leading to the removal of [Child] continued to exist or conditions of a potentially harmful nature exist such that there is little likelihood that those conditions will be remedied at an early date so that [Child] can be returned to the parental home in the near future or that the continuation of the parent and child relationship greatly diminishes [Child's] prospects for early integration into a stable and permanent home due to [F]ather's incarceration, lack of bond with the minor child and inability to provide the child with the necessary care, custody and control, in that [F]ather had su[bs]tantially complied with the terms of his social service plan by maintaining contact with his case worker, requesting visits, provision of in-kind items, successful completion of a paternity test, anger management classes, parenting classes, life skills and other classes, to establish that he was interested in, and committed, to providing [Child] with the necessary care, custody and control.
[4] "Appellate courts will review conflicting evidence in the light most favorable to the judgment of the trial court." In re A.S.W., 137 S.W.3d 448, 452-53 (Mo. banc 2004). At the same time, the evidence supporting termination must be clear, cogent and convincing such that it "instantly tilts the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true." Id. at 453 (emphasis added). Therefore, our recitation of facts necessarily includes evidence both favorable and unfavorable to the trial court's decision.
[5] Another caseworker, who did not testify, had handled the case immediately after Strickland.
[6] None of the case files judicially noticed by the trial court have been included in the record on appeal. In addition, none of the docket sheets from the underlying abuse/neglect case have been provided. We presume they would support Respondent's petition and the trial court's judgment. See In re C.A.M., 282 S.W.3d 398, 401 (Mo.App. S.D.2009).
[7] Those programs/classes included anger management, "hit-no-more," Living Free, life skills, 11 Logic Parenting Skills, Four Faith Steps to Freedom, and Stepping into Freedom. Father said he took the classes for the benefit of Child, but also stated: "And plus it was required through, you know, the State told me I had to take them too, so I took them then."
[8] These children were all fourteen or older and were either residing on their own or with their mother. Father was not providing any monetary support to any of them. Father did not testify that Child would be able to live with any of her siblings.
[9] Father later conceded that Child knew her foster parents and knew their home as her own.
[10] The child was in protective custody because of the mother's "condition and behavior" at the hospital after the child's birth. Id. at 633. "The caseworker did not want [the c]hild to see [the f]ather in prison, but often when [the f]ather's mother visited [the c]hild, [the f]ather talked to [the c]hild by phone." Id. at 634.
[11] "Parenting is frequently a group effort. Children are often raised with extensive help from grandparents, siblings, extended family, neighbors, day care, baby sitters, a nanny, or an array of public and private service organizations." A.S.W., 137 S.W.3d at 453. That is not to say that a parent may retain legal custody and control of a child indefinitely while exerting virtually no effort to reach out for help on the child's behalf and relying exclusively on that community to provide the actual care.
[12] The importance of support paid by an incarcerated parent is not necessarily the amount of the supportindeed there is often no expectation that a parent can financially support a child under such circumstances. "While such a contribution from an incarcerated parent will not significantly assist in providing the child with essentials, even a minimal contribution evinces a parent's intent to continue the parent/child relationship. Evidence of this intent is lacking, however, where a parent fails to make any contribution, no matter how diminutive the amount." In re R.K., 982 S.W.2d 803, 807 (Mo.App. W.D.1998) (citations omitted).
[13] After the trial, the trial court ordered the parties to submit proposed judgments and invited the parties to comment on specific factual issues. In response, Father's counsel filed a letter informing the trial court that Father is incarcerated for both second-degree robbery and armed criminal action. According to Father's attorney, Father would be required to serve 80% of his ten-year sentence and "would be eligible for release at the earliest possible date of November [ ] 2015."